TETLEY, INC., Plaintiff,

v.

TOPPS CHEWING GUM, INC., Defendant.

No. CV–82–3722.

United States District Court, E.D. New York.

Feb. 17, 1983.

Albert Robin, New York City, for plaintiff.

Colvin, Miskin, Basseches & Mandelbaum and Shea & Gould by Mark T. Basseches and Jeffrey H. Squire, New York City, for defendant.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Plaintiff, Tetley, Inc., commenced this action asserting federal and pendent state statutory and common law claims, alleging that it has been damaged by defendant's distribution and sale of gummed stickers, known as "Wacky Packages" or "Wacky Packs," which satirically depict the retail packages of various mass-marketed commercial products. Plaintiff is a seller of a variety of beverage products under the trademarks "Tetley" and "The Tiny Little Tea Leaf Tea," using designs and packaging said to bear a distinctive trade dress and also a licensor of its trademarks to others and a holder of related patents on its products. Plaintiff alleges that defendant offers for sale and sells in interstate commerce a Wacky Packs sticker displaying a simulation of plaintiff's trademarks, designs, and trade dress in the form, *inter alia*, of a label reading "Petley Flea Bags," which is likely to cause confusion in the marketplace. Plaintiff expresses concern that consumers will be given the mistaken impression that the offending stickers are made by or for, are endorsed or sponsored by, or are otherwise connected with Tetley. Plaintiff further alleges that defendant's use of Tetley's· trademark properties is without license or permission.

Plaintiff has pleaded in its complaint six causes of action, including: (1) common law disparagement of plaintiff and its product, (2) common law misappropriation of the good will associated with plaintiff's trademarks and trade dress, (3) dilution of plaintiff's trademarks and trade dress, in violation of § 368–d of the New York General Business Law, (4) trademark infringement, in violation of 15 U.S.C. § 1114(1), (5) common law unfair competition, and (6) false designation of origin, description, and representation, in violation of 15 U.S.C. § 1125(a).

This matter is before the Court on plaintiff's application for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure prohibiting defendant and anyone affiliated with it from manufacturing, advertising, offering for sale, selling, distributing or otherwise disposing

of "Wacky Packs" stickers and related products bearing a simulation of plaintiff's trademarks, design, and trade dress. An evidentiary hearing on plaintiff's application was conducted on December 28, 1982. For the reasons stated below, the application for a preliminary injunction is denied. What follows sets forth this Court's findings of facts and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure based on the evidence elicited at the hearing and the undisputed portions of the complaint and affidavits filed in connection with this motion.

It is undisputed that plaintiff has been and now is selling a variety of tea products under the registered trademarks "Tetley" and "Tetley Tea" displayed on a package design. In addition, over ten years ago, plaintiff adopted "The Tiny Little Tea Leaf Tea" slogan and design as a trademark for its product which it has used on its packaging. The slogan was registered in June 1982. Plaintiff has also used these marks and designs in television, radio, magazine, and newspaper advertising and has licensed these trademarks and designs on other products including towels, umbrellas, mugs, and coolers.

It is also undisputed that defendant, Topps Chewing Gum, Inc., is a manufacturer of bubble gum, sports trading cards and stickers, and other candy and novelty products primarily designed for children. Defendant has, from time to time since 1967, created and sold Wacky Packs which, in the current version, are sold at retail five to a pack, the packs being supplied to retail vendors in cartons of one hundred packs. The Wacky Packs stickers satirize the retail packages of some 120 mass-marketed commercial products by depicting replicas of the familiar packages and altering the true product names, logos, slogans or package designs by means of puns, caricatures, and the like. Thus, a can of Pepsi-Cola becomes "Pupsi-Cola: The Soft Dunk for Dogs," on a sticker depicting a replica of a soda can with the "Pepsi-Cola" logo and a sketch of a dog sipping cola through a straw. Head and Shoulders shampoo becomes "Head and Boulders Shampoo," labelled as being "for people with rocks in their heads" on a sticker depicting a replica of the familiar Head and Shoulders bottle with a caricatured face and a gravel-like substance emanating from the spout. The gummed stickers measure three inches by two inches and are sold backed with waxed paper depicting, inter alia, the "Wacky Packages" logo, the number of the sticker in the series of 120 stickers, and the message, "It's Topps for fun ... Collect the entire set of 120 stickers." The individual packs of five stickers are sealed so that there is no way of identifying from the exterior of the packet which five stickers out of the series of 120 are contained in the pack.

As may be gleaned from the above, Wacky Packs are directed at children ages 6 to 12 and are distributed at retail primarily through candy, tobacco, and convenience stores. A limited number of stickers are distributed by an agent of defendant to collectors in a manner that will be discussed more fully below.

The present dispute arises out of one of the current series of 120 Wacky Packs stickers that bears the name "Petley" on a picture of an orange and blue box, which both parties agree is designed and intended to be a replica of the box in which Tetley tea bags are commonly sold at the retail level. Shown on the box is a sitting dog depicted as furiously scratching fleas with one of his hind legs. The box pictured on the sticker has written on it, in lettering and coloring similar to that used on the Tetley tea bag box, "40 Flea Bags," "Orange Pekingese Fleas," and, around a silhouette of an insect, "Tiny Little Dog Fleas."

Defendant asserts, without contradiction, that the "Petley" sticker was first distributed by it in a slightly smaller version in a prior Wacky Packs series of 30 stickers that was released in 1975 and continued to be distributed through 1977, when the current series was launched. While plaintiff does not dispute that the sticker it now complains of has been in circulation some seven years, it denies that it had any knowledge of the sticker in question until October of

this year. Defendant asserts, again without dispute from plaintiff, that at least 200,000 Petley stickers were included among the Wacky Packs stickers sold between 1975 and 1977 and that approximately 400,000 "Petley" stickers have been printed and in large part already distributed as part of the current series comprised of some 9,500,000 packs of stickers.

Plaintiff states that on October 7, 1982, after it first learned of defendant's sticker, plaintiff's vice president and general counsel sent a letter to defendant's president demanding immediate discontinuation of the "Petley" sticker. Defendant has taken the position in response to this demand that it will continue distribution of the "Petley" sticker until the current printing is exhausted in the spring of 1983, but that the "Petley" sticker will be removed from the Wacky Packs series thereafter.

Plaintiff now seeks to enjoin, pending the final disposition of this action, the distribution and sale of the "Petley" stickers remaining in defendant's inventory. That inventory consists of approximately ten million stickers of all varieties sealed in two million packs. Approximately 80,000 "Petley" stickers are to be found within the two million sealed packages. Eighty percent of the current Wacky Packs printing of 9.5 million packs of stickers has already been sold and shipped, and defendant's current inventory contains the final 20% of its total production. In addition, · approximately 4,500 stickers are not in sealed packages but are sold by mail in groups of ten, so that children collecting Wacky Packs stickers in a pre-printed sticker album also sold by defendant can complete their collections without buying additional packs at retail. Defendant's current inventory of two million packs containing ten million stickers has a wholesale value of $300,000.

Plaintiff has advanced in support of its application for a preliminary injunction only its claims pursuant to the federal trademark laws and § 368–d of the New York General Business Law. Accordingly, the common law causes of actions pleaded in its complaint are not considered in connection with this application.

## DISCUSSION

The standard in this Circuit for obtaining a preliminary injunction requires a showing of (1) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Sperry International Trade, Inc. v. Israel,* 670 F.2d 8, 11 (2d Cir.1982), citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (*per curiam*).

Under the federal trademark laws, the issues of irreparable injury and a likelihood of success on the merits are intertwined.

> "In the preliminary injunction context, a showing of likelihood of confusion as to the source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm."

*Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir. 1982) (citations omitted).

As one court noted with respect to trademark claims in general:

> "The Court's analysis of 'likelihood of confusion' must be supplemented by a consideration of the 'balance of the equities,' which latter inquiry takes into account three interests: those of the senior user, those of the junior user, and those of the public consumer. *Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1172 (2d Cir.1976); *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 155 (S.D.N.Y.1980). The Court thus must first inquire whether the instant case presents any likelihood of confusion and, if it does, then proceed to strike the balance of equities. *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1139–40 (2d Cir.1979); *see* Goldberg & Borchard, *Related Goods Trademark Cases in the Second Circuit,* 70 Trademark Rep. 287, 305–06 (1980)."

*Lambda Electronics v. Lambda Technology, Inc.,* 515 F.Supp. 915, 924 (S.D.N.Y.1981).

Assuming that plaintiff's trademarks are entitled to protection, a federal cause of action for trademark infringement requires, *inter alia,* that the defendant use a colorable imitation of the trademark which is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). A central inquiry in all cases of alleged trademark infringement is the likelihood of confusion or the "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). " 'The touchstone of trademark infringement under the Lanham Act . . . is "likelihood of confusion." ' " *Stop the Olympic Prison v. U.S. Olympic Committee,* 489 F.Supp. 1112, 1121 (S.D.N.Y.1980), quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

As has been held with respect to claims pursuant to 15 U.S.C. § 1125(a):

> "The likelihood of confusion, rather than actual confusion, is the test. It is not necessary that the false designation of origin or false description be willful or intentional. Nor must the consumer believe that the item actually originated with the plaintiff. It is sufficient that it appear that plaintiff may have sponsored or otherwise approved of defendant's use. These precepts accord with the statute's remedial nature which is to be broadly construed."

*American Optical Corp. v. North American Optical,* 489 F.Supp. 443, 450 (N.D.N.Y.

1979), citing *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979); *CBS Inc. v. Springboard International Records,* 429 F.Supp. 563 (S.D. N.Y.1976); *Apollo Distributing Co. v. Apollo Imports Inc.,* 341 F.Supp. 455 (S.D.N.Y. 1972); *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288 (S.D.N.Y.1972); *Geisel v. Poynter Products, Inc.,* 283 F.Supp. 261 (S.D.N.Y.1968). *See also American International Group, Inc. v. London American International Corp. Ltd.,* 664 F.2d 348, 351 (2d Cir.1981). Furthermore, "[a]lthough 'confusion' in this context has traditionally meant confusion as to the source or origin of goods or services in connection with which a trademark is used, courts have come to accept confusion as to sponsorship, endorsement, or some other affiliation as satisfying the requirement." *Stop the Olympic Prison v. U.S. Olympic Committee, supra,* 489 F.Supp. at 1121–22 (citations omitted). On the basis of the facts and arguments presented and the relevant legal considerations, I conclude that plaintiff is unlikely to succeed on the merits of its trademark infringement claims since it is unlikely that it will succeed in establishing that anyone would think defendant's sticker had a connection with plaintiff's products.

The determination as to whether defendant's sticker creates a likelihood of confusion may be analyzed in terms of (1) the strength of plaintiff's marks, (2) the degree of similarity between the marks used by plaintiff and defendant, (3) the proximity of plaintiff's and defendant's products, (4) evidence of actual confusion, and (5) defendant's good faith in adopting its marks. *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).[1] Assuming the strength of plaintiff's marks,

---

1. Plaintiff argues that "[s]ince this is a case involving confusion as to sponsorship and not source," consideration of factors such as those used in *Polaroid* and several recent Second Circuit trademark infringement cases is inappropriate. However, the *Polaroid* factors have been employed in cases involving allegations of confusion as to sponsorship. *See, e.g., Standard & Poor's Corp., Inc., supra,* 683 F.2d at 704. Moreover, while the distinction between a claim that an allegedly infringing product will create confusion as to source and a similar claim based on confusion as to sponsorship may present differences, it is not clear why a different legal analysis is required. Both types of claim involve the allegation that the consuming public will, as a result of purported infringement, be misled into thinking that there is some commercial relationship between the infringing and the infringed upon product.

there is both obvious similarity and equally obvious dissimilarity between plaintiff's marks and defendant's sticker. This is because defendant's sticker is a broadly "punned" adaptation of plaintiff's marks. The very broadness of the joke is a measure of the difference between Tetley's marks and Topp's sticker. While defendant has satirically adapted plaintiff's packaging colors and design and has substituted "Petley" for the "Tetley" mark printed on plaintiff's package, "Orange Pekingese Fleas" for the "Orange Pekoe and Pekoe Cut Black Tea" label printed on plaintiff's package, "40 Flea Bags" for the "48 Tea Bags" label printed on plaintiff's package, and "Tiny Little Dog Fleas" for the "The Tiny Little Tea Leaf Tea" mark printed on plaintiff's package, such broad satirical adaptation draws a heavy line between itself and the object of satire.

Of course, an inquiry into the degree of similarity between two marks does not end with a physical comparison of the marks themselves. Since " 'the setting in which a designation is used affects its appearance and colors the impression conveyed by it, it is the effect upon prospective purchasers that is important.' " *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1130 (2d Cir.1982), *quoting McGregor-Doniger, Inc. v. Drizzle, Inc., supra*, 599 F.2d 1133. In this connection, it is noteworthy that the settings in which plaintiff's marks and defendant's stickers and designs are used differ considerably. Plaintiff's marks, as noted, are used on straight-forward commercial packaging and advertisements to sell its beverage products to consumers. The face of each of defendant's stickers is a picture of a product's packaging and labelling rather than itself a package or label. The back of each sticker bears the number of the sticker in the series and reads "Wacky Packages Album Sticker," "Peel Off Sticker Carefully!" "To Collect Your Stickers ... Ask your dealer for the Topps Wacky Packages Sticker Album" "It's Topps for fun" "Collect the entire set of 120 stickers" "1982 Topps Chewing Gum,

Inc." The packaging of the products also adds to the lack of similarity between the marks. The front of Wacky Packs packages are prominently marked "Wacky Packages Stickers" "Topps" and "5 Album Stickers" with a caricature of a youth wearing a baseball cap holding the Wacky Packs parody of defendant's own product, Bazooka Bubble Gum. On the back of each package are the following messages:

> "Remember ... your TOPPS Wacky Packages Stickers are made to go into the TOPPS Wacky Packages Sticker ALBUM. Look for this exciting ALBUM where you purchase your Wacky Packages Stickers."

> "The TOPPS Wacky Packages Sticker ALBUM has individually designed pages to display your TOPPS Wacky Packages Stickers. Ask your dealer for it today."

Most "Petley" stickers only become visible to the Wacky Packs purchaser after he or she has opened the outer wrapping of defendant's product. A limited number of "Petley" stickers are sold loosely directly to collectors, but only after the purchaser mails a letter directly to defendant's distribution agent requesting that sticker specifically.[2] The "Petley" sticker is one of a series of 120 stickers, each satirizing an individual product, up to five of which appear in every pack purchased. The very name "Wacky Packages" indicates their satirical intent and design. Given the differences between plaintiff's marks and defendant's stickers, the contrast between it and the setting in which plaintiff's marks and defendant's stickers appear, and the contrasting impression conveyed, the similarity between those marks and defendant's designs appears quite slight.

Considering the next of the *Polaroid* factors, it is clear that plaintiff's products and Wacky Packs are not proximate products. They exist in non-competing markets. Plaintiff's products and those of defendant are sold in different outlets, the former being sold for the most part in supermar-

---

**2.** There is no evidence that anyone has ever written to Tetley for a sticker. *Cf. Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972).

kets or grocery stores, while the latter are generally sold in candy and novelty stores. Moreover, plaintiff's products are directed principally towards food and beverage purchasing adults. Wacky Packs are directed towards children between 6 and 12 years of age.

Plaintiff has presented no evidence at all of actual confusion as to either the source or sponsorship of the "Petley" sticker. While "evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Grotrian, Helfferich, Schulzth. Steinweg Nachf. v. Steinway & Sons,* 365 F.Supp. 707, 715–16 (S.D.N.Y.1973), aff'd, 523 F.2d 1331 (2d Cir. 1975). Moreover, "[w]hile a plaintiff need not prove actual confusion in order to prevail, ... 'it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion.'" *McGregor-Doniger, supra* at 1136 (citations omitted). Plaintiff's conceded ignorance of the existence of the "Petley" sticker, despite defendant's undisputed assertion that it has been in distribution since 1975, serves to buttress such an inference. Had plaintiff's customers been confused as to the source or sponsorship of the "Petley" sticker, it seems likely that inquiries or complaints would have been forthcoming. *See McGregor-Doniger, supra* at 1136 n. 6.

With respect to whether defendant's use of marks and designs based on those of plaintiff has been in "bad faith," the worst that can be said is that defendant chooses to satirize popular products with the thought undoubtedly in mind that the more recognizable and popular the product satirized, the more successful the particular sticker will be. However, there is no evidence that defendant, in seeking to profit by the degree of recognition of plaintiff's mark, either thought to realize that profit by means of confusion or contemplated injury to plaintiff's mark. In this connection, it is noteworthy that defendant has, according to the testimony of its president, parodied over 500 products since the inception of the Wacky Packs promotion and has not been sued before on grounds of trademark infringement. It bears noting as well in this connection as well that defendant satirizes its own Bazooka Bubble Gum, baseball and football card products, and, indeed, its Wacky Packs product itself on a sticker entitled "Wormy Packages" and labelled as being manufactured by "Ticks" instead of "Topps" and as being "Just Dug Up" and "With Stinky Album Stickers." The sticker depicts multicolored worms and caterpillars crawling out of two jars and a toothpaste-like tube. Finally, the back of each Wacky Packs package bear the following note:

> "Hey, the stickers that Topps Chewing Gum created are all in fun. The products we're spoofing—including our own—are all good ones, no kidding. So enjoy!!"

Plaintiff relies on several recent decisions in this Circuit involving parody and the trademark laws, which, indeed, serve to focus the inquiry. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd., supra,* 604 F.2d 200, the Court of Appeals for this Circuit upheld the district court's issuance of a preliminary injunction barring the distribution or exhibition of a "sexually depraved" motion picture entitled "Debbie Does Dallas" on the ground that its depiction of the Dallas Cowboys Cheerleaders' uniform infringed the trademark plaintiff held in that uniform, since the public was likely to be confused as to the trademark owner's production, sponsorship or approval of the use of the trademark in the film. The court concluded that the district court "did not err in holding that plaintiff had established a likelihood of confusion within the meaning of the Lanham Act sufficient to entitle it to a preliminary injunction...." The court also found that defendant's film "hardly qualifies as parody...." *Id.* at 206.

What distinguishes the *Dallas Cowboys* case from this one are the proximity of the two products involved in the *Dallas Cowboys* case, both competing in what the court characterized as a common national entertainment market and the evidence, present

in the *Dallas Cowboys* case but not in this one, of a deliberate intent to exploit the trademark owner's success by creating confusion as to whether the allegedly infringing film was, in fact, sponsored by or had its source with the plaintiff. As the court noted in the *Dallas Cowboys* case, the Dallas Cowboys Cheerleaders perform dance and cheerleading routines at Dallas Cowboys football games, "have appeared frequently on television programs and make commercial appearances at such public events as sporting good shows and shopping center openings," and appear in their uniforms on posters, calendars, T-shirts, and the like which "have enjoyed nationwide commercial success, due largely to the national exposure the Dallas Cowboys Cheerleaders have received through the news and entertainment media." 604 F.2d at 202.[3] The challenged film also sought success in the national entertainment market and did so by depicting a cheerleader at a fictional high school who was selected to become a "Texas Cowgirl" cheerleader and who, along with her entire cheerleading squad, was sent to Dallas. The principal character appeared in the film wearing a uniform strikingly similar to that worn by the Dallas Cowboys Cheerleaders, and the film was advertised with posters depicting that character in the infringing uniform with such captions as "Starring Ex Dallas Cowgirl Cheerleader Bambi Woods" and "You'll do more than cheer for this X Dallas Cheerleader." 604 F.2d at 202–03. In both its content and its promotion, the court found that the film constituted a bad faith attempt to confuse and deceive the public into believing that the Dallas Cowboys Cheerleaders had sponsored the film or had some other relationship with it.

In the present case, not only are plaintiff's and defendant's products distributed in different markets, but there appears at this stage of the litigation no bad faith

attempt to exploit the plaintiff's product by creating confusion as to whether plaintiff is a source or sponsor or otherwise connected with defendant's efforts. On the contrary, the very heavy handedness of defendant's parody would appear to assure that a clear distinction will be preserved in a consumer's mind between plaintiff's product and the Wacky Pack sticker.

A second decision involving parody and the trademark laws on which plaintiff relies is *Coca-Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183 (E.D.N.Y.1972). In that case the defendant printed and sold a poster depicting the familiar red and white "Coca-Cola" logo normally seen with the message "Enjoy Coca-Cola," but substituted the word "Cocaine" for the word "Coca-Cola." In the face of the defendant's argument that no reasonable purchaser would think that the poster was either published or authorized by the plaintiff, the court found that plaintiff had made "a sufficiently clear showing of a high probability of confusion resulting from defendant's use of the 'Coca-Cola' trademark format in an advertising context" to qualify for injunctive relief. *Id.* at 1191.

What was present in the *Coca-Cola* case and missing here was "factual proof that some persons of apparently average intelligence did attribute sponsorship to plaintiff and discontinued their use of plaintiff's product as an expression of resentment." *Id.* In the *Coca-Cola* case, affidavits of a Pennsylvania mother and three employees of a Pittsburgh television station were submitted attesting to the facts that the mother observed the "Enjoy Cocaine" poster on sale at a local shopping mall, found it to be offensive, called the Coca-Cola bottler in Pittsburgh to register a complaint, purchased a copy of the poster, and brought it to the attention of a television news reporter who had received calls from other persons "deploring such advertising and

---

**3.** As examples of such " 'pop art' novelty advertising," the court noted:

"Plaintiff has authorized the use of its logo trademark as a decorative fabric pattern for such clothing items as beach pants and shorts, beach hats, bowling shirts and blouses, sweatshirts, dungarees and aprons and on a variety of other articles in common use including jewelry, portfolios, pocket radios, cigarette lighters, pens and pencils, playing cards, lamps and glasses."

346 F.Supp. at 1190 n. 10.

threatening a group boycott of Coca-Cola," *Id.* at 1189 and n. 9. Moreover, the television news director "also received calls from irate members of the public, all of whom attributed the poster to plaintiff and voiced disapproval because of the drug problem." *Id.* at 1189 and n. 9. In addition, the court noted:

> "Not only does visual comparison of defendant's poster with specimen advertising of plaintiff indicate the likelihood of such a mistaken attribution but recent so-called 'pop art' novelty advertising utilized by plaintiff may have served to further the impression that defendant's poster was just another effort of that kind by plaintiff to publicize its product."

*Id.* at 1189–90.[4] In this case not only is there no evidence of actual confusion (or evidence from which a likelihood of actual confusion may be inferred), there is also none of the identical imagery characteristic of "pop-art." Nor does there appear to have been any effort by plaintiff to exploit the "pop-art" values of its mark.

A third parody decision in this Circuit on which plaintiff relies is *Gucci Shops, Inc. v. R.H. Macy & Co., Inc.,* 446 F.Supp. 838 (S.D.N.Y.1977). In that case defendants manufactured and sold a diaper bag bearing the familiar red and green Gucci stripes and the word "GUCCHI." The court enjoined defendants from manufacturing, distributing or selling the diaper bag on the following grounds:

> "[D]efendant's mark is placed on a similar item. Though Fashioncraft [the manufacturer of the diaper bag] carefully stresses that it manufactures a 'diaper bag,' the article closely resembles an ordinary travel or tote bag, one of the items upon which plaintiff places the trademark 'GUCCI' in conjunction with the GUCCI stripe. It is not inconceivable that at a glance, the 'GUCCHI' mark on what appears to be a tote bag would mislead members of the public into believing that the plaintiff has allowed its mark to be copied or that plaintiff is

somehow associated with the manufacture, promotion, and sale of the 'diaper bag.' "

446 F.Supp. at 839–40. In the instant case, defendant's parody of plaintiff's mark is placed on a sticker which is clearly remote from any product sold by plaintiff. Moreover, a glance would suffice to make clear that plaintiff is not, in any way, associated with the manufacture, promotion or sale of defendant's sticker.

In sum, the distinctions between plaintiff's products and defendant's stickers all indicate that this case resembles those parody cases which have not resulted in the issuance of an injunction because the plaintiff could not demonstrate a likelihood of prevailing on the merits by showing a likelihood of confusion as to source, sponsorship or endorsement. *See, e.g., Reddy Communications v. Environmental Foundation,* 477 F.Supp. 936 (D.D.C.1979); *Girl Scouts of the United States of America v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228 (S.D.N.Y.1969); *Stop the Olympic Prison, supra,* 489 F.Supp. 1112.

Plaintiff has also failed to demonstrate a likelihood of success on the merits of its claim of dilution of its trademarks and trade dress in violation of § 368–d of the New York General Business Law. That statute provides:

> "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

The statute "is designed to protect the distinctiveness of an owner's trademark from being undercut by another's similar use." *Dreyfus Fund v. Royal Bank of Canada,* 525 F.Supp. 1108, 1125 (S.D.N.Y.1981), citing *Mortellito v. Nina of California, supra* at 1296; *King Research, Inc. v. Shulton, Inc.,* 324 F.Supp. 631, 638–39 (S.D.N.Y. 1971). In its most recent pronouncement

---

**4.** As the lower court noted, the Dallas Cowboys Cheerleaders "have become a highly popular entertainment group." *Dallas Cowboys Cheerleaders, supra,* 467 F.Supp. at 370.

on this statute, the New York State Court of Appeals stated that it was not necessary to prove confusion between the marks at issue in order to obtain an injunction thereunder. *Allied Maintenance v. Allied Mechanical Trades,* 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162 (1977). While the Court of Appeals for this Circuit has on one occasion characterized this statement as *dictum* and "contrary to the weight of state and federal authority," *Mushroom Makers, supra,* 580 F.2d at 49, it has, most recently, applied the state Court of Appeals' decision at face value. *See Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621 (2d Cir. 1983); *Dallas Cowboys, supra* at 205 n. 8. *See also Information Clearing House, Inc. v. Find Magazine, supra; Spring Mills v. Ultracashmere House, Ltd.,* 532 F.Supp. 1203, 1221 (S.D.N.Y.), *rev'd on other grounds,* 689 F.2d 1127 (2d Cir.1982). Assuming that plaintiff need not prove confusion under § 368–d, I nevertheless conclude that it is improbable that plaintiff will be able to establish a "[l]ikelihood of . . . dilution of the distinctive quality of a mark or trade name."

Plaintiff has, first of all, not established that its trademark or name is "truly of *distinctive* quality" (emphasis in original) or one which has "acquired a secondary meaning in the mind of the public." *Sally Gee, Inc. v. Myra Hogan, Inc., supra* 699 F. 2d at 625. While the fact that .defendant has sought some commercial advantage from the public's associations with plaintiff's name is some evidence relevant to this issue, it bears noting that plaintiff's trademark is, in this regard, no more distinctive from defendant's point of view than 120 other trademark owners whose product names defendant has parodied. Plaintiff itself has offered no proof at all of the public's associations with its name, much less that the public regards its name as of "truly distinctive quality."

Nor is it likely that plaintiff will prevail in establishing as a fact that defendant's conduct will "blur a mark's product identification" or "tarnish the affirmative associations a mark has come to convey." *Id.* at 625. Once again, the broad humor defendant employs serves to prevent the type of blurring which might result from a more subtle or insidious effort at humor at plaintiff's expense. While plaintiff complains that defendant's childish humor, in choosing the rhyme word "flea" to parody its tea, will result in images of impurity, adulteration, and contamination in the minds of its customers, it has offered absolutely no evidence to that effect.[5] No evidence has been presented either from lay consumers (as in the *Coca-Cola* case) or experts in advertising or marketing or any other field that anyone would actually arrive at such a conclusion. The fact that defendant's sticker has gone unnoticed even by plaintiff's marketing personnel for over seven years constitutes significant proof that its products have not suffered from defendant's efforts in the past and are unlikely to do so for the short period of time during which defendant proposes to continue them in the future.

Finally, turning to the second prong of the preliminary injunction test and assuming that there are indeed sufficiently serious questions going to the merits of this dispute so as to make them a fair ground for litigation, I am unable to conclude that the balance of hardships tips decidedly toward plaintiff. *Sperry International Trade, Inc. v. Israel, supra,* 670 F.2d at 11. Defendant has undertaken voluntarily to suspend production of the offending sticker in its next printing run. What is at stake in this application, accordingly, are the relative consequences for both parties of permitting defendant's existing inventory to be distributed. In this connection it is undisputed that stickers are randomly sorted and packaged so that retrieval of all the "Petley" stickers in defendant's inventory

---

**5.** Counsel's apparent suggestion in oral argument that defendant's stickers will cause consumers to conclude that plaintiff's products have been adulterated in the manner in which certain commonly used pain killers are said to have been recently adulterated seems not only speculative but itself heavy-handed.

would require defendant's employees to open manually each display carton and each paper package, locate and extract any "Petley" stickers found, replace the removed stickers with new stickers, and, if possible, reseal the packages and cartons. Defendant has asserted, without contradiction by plaintiff, that performing this process would cost more than its inventory is worth, so that issuance of a preliminary injunction would require it to destroy its entire inventory. As of December 20, 1982, defendant had an inventory of approximately 10,000,000 stickers sealed in 2,000,000 packages, having a wholesale value of $300,000.

Plaintiff argues that defendant's packaging practices are themselves unreasonable and that defendant should not be permitted to interpose the difficulties with which it would be confronted in the face of an injunction because of those packaging practices as a hardship for this court to consider. Plaintiff argues that it would have been prudent for defendant to prepackage a smaller inventory or to group or code its packages so as to enable it to determine their contents without opening them. However, plaintiff has not suggested that defendant's packaging practices and procedures were in any way pursued in contemplation of the instant litigation or intentionally to block injunctive relief.

Plaintiff has also suggested that defendant's packaging of five Wacky Packs stickers in an opaque wrapper, forcing consumers to buy stickers they desire as well as those they do not desire in one purchase, constitutes an illegal tying arrangement, in violation of federal and state antitrust laws. A tying arrangement is " 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.' " *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56 (2d Cir.1980), quoting *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The first of the elements of a tying offense is proof of a tying and a tied product. *Yentsch,* 630 F.2d at 56–57, citing *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286, 1289 (2d Cir.), *cert.*

*denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). Plaintiff has not demonstrated the existence of a tying and a tied product sold by defendant. On the contrary, plaintiff's allegation in this regard is premised on an inaccurate characterization of defendant's product. Defendant in fact sells its stickers in packages of five and does not sell individual stickers, except for its limited distribution to collectors.

Finally, it is undisputed that the vast majority of "Petley" stickers have already been distributed from defendant's inventory. Defendant's most recent inventory figures state that, apart from the less than 4,500 stickers maintained in the separate batch to collectors, approximately 80% of the present series of stickers has already been sold and shipped with ten million stickers still in defendant's inventory. Plaintiff seeks to block distribution of only 20% of the "Petley" stickers produced as part of the current series and an even lower percentage of the entire number of "Petley" stickers distributed since 1975. Plaintiff seeks, in effect, to have the dike plugged after nearly all the water has run out.

One further consideration weighs in defendant's favor. In *Girl Scouts, supra,* 304 F.Supp. 1228, a case in which the plaintiff sought unsuccessfully to enjoin the printing, distribution, and sale of a poster depicting "a smiling girl dressed in the . . . green uniform of the junior girl scouts with her hands clasped above her protruding, clearly pregnant abdomen" and bearing the caption "BE PREPARED," *id.* at 1230, the court stated that the relief sought "would constitute an infringement of that right of satirical expression 'deserving of substantial freedom—both as entertainment and as a form of social . . . criticism' referred to in *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541, 545 (2d Cir.1964), *cert. denied,* 379 U.S. 822 [85 S.Ct. 46, 13 L.Ed.2d 33] (1965)."

The same might indeed be said with respect to any effort to enjoin production, distribution and sale of defendant's "Petley" sticker. *See* Edwards, "Wacky Packs:

New Fad for the Children of The Skeptical Seventies," *New York Magazine* 36 (Oct. 1, 1973). As the Second Circuit held in *Berlin v. E.C. Products, Inc., supra:*

"As the readers of Cervantes' 'Don Quixote' and Swift's 'Gulliver's Travels,' or the parodies of a modern master such as Max Beerbohm well know, many a true word is indeed spoken in jest. At the very least, where, as here, it is clear that the parody has neither the intent nor the effect of fulfilling the demand for the original, and where the parodist does not appropriate a greater amount of the original work than is necessary to 'recall or conjure up' the object of his satire, a finding of infringement would be improper."

329 F.2d at 545.

Having failed to satisfy the requirements for preliminary injunctive relief, plaintiff's motion for a preliminary injunction is denied.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.