**L.L. BEAN, INC., Plaintiff,**

v.

**DRAKE PUBLISHING, INC., Gloria Leonard, Louis Montesano, Nina Malkin, Linda Francischelli, Kevin Goodman, Kenneth Kimmel, Larry Graver, Arnold Held, Bruce Jacobsen, L.E. Goodman, Richard Crespo, Marty Puntus, Jerry Levine, Susan Ercolano, Yamael Bonheur, and Joy Bonheur, Defendants.**

**Civ. No. 84–0305 P.**

United States District Court,
D. Maine.

Jan. 16, 1986.

George S. Isaacson, Alfred C. Frawley, Brann & Isaacson, Lewiston, Me., David Wolf, Wolf, Greenfield & Sacks, Boston, Mass., for plaintiff.

Elliott L. Epstein, Isaacson, Hark & Epstein, Lewiston, Me., Norman S. Beier, Lawrence E. Abelman, Abelman, Frayne, Rezac & Schwab, New York City, for defendants.

## ORDER ON PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

GENE CARTER, District Judge.

Plaintiff owns the registered trademarks "Bean," "Bean's" and "L.L. Bean" and uses them in its mail order catalog for marketing sporting goods and wearing apparel. Defendants publish *High Society*, a magazine which describes itself as providing erotic entertainment. At pages 36 and 37 of the October 1984 issue of *High Society*, there is material identified as "L.L. Beam's Sex Catalog." In this action Plaintiff seeks damages and equitable relief under both federal and state law for alleged trademark dilution, infringement, unfair competition, deceptive trade practices, interference with prospective business advantage, and trade libel. Defendants have moved for summary judgment on all counts, and Plaintiff has filed a cross-motion for summary judgment on all but Count VI. Count VIII, Plaintiff's claim for punitive damages, is not discussed in Defendants' submissions and the resolution of Plaintiff's motion does not necessitate addressing that claim at this time. The Court will address the counts brought under federal law first.

### Count II

Count II seeks relief for trademark infringement under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), which provides that:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such

use is likely to cause confusion, or to cause mistake, or to deceive;

. . . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Defendants concede, for purposes of this motion, that Plaintiff has registered trademarks in "Bean," "Bean's" and "L.L. Bean." They also concede that "L.L. Beam's" and "Beam's," terms used in their catalog, are colorable imitations of the "Bean's" trademark. Defendants contend, however, that Plaintiff cannot prove the required element of likelihood of confusion. *See Pignons, S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486–87 (1st Cir.1981).

In *Pignons* the Court of Appeals set forth several factors to be considered in assessing likelihood of confusion: the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendant's intent in adopting its mark; and the strength of the plaintiff's mark. *Id.*

In considering the similarity of the marks, the Court first notes Defendants' concession that their use of L.L. Beam is a colorable imitation of the L.L. Bean trademark. Similarity, however, "is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Id.* at 487. Often, similar marks are not as likely to be confused when they are used in conjunction with the clearly displayed name and/or logo of the manufacturer. Defendants suggest that the L.L. Beam mark is used in conjunction with the name *High Society* and its source is, therefore, not likely to be confused with the real L.L. Bean. The name *High Society* is displayed prominently on the cover and repeatedly throughout the magazine. The table of contents shows the two in conjunction. The name *High Society* does not, however, appear on the particular pages on which the sex catalog

is found. The total effect of the designation, which bears on the factor of similarity, is unclear and best left for resolution by a trier of fact.

■ Although the Court of Appeals affirmed the granting of summary judgment in *Pignons,* it did so because "[t]aking everything in Pignons' favor, still none of the factors relevant to a finding of likelihood of confusion supports Pignon's position." In this case Plaintiff has submitted data generated by a commissioned market survey which could be interpreted as showing that at least 11.5% of those surveyed were in fact confused as to the source of the "L.L. Beam Sex Catalog." Plaintiff has also submitted expert testimony in affidavit form verifying this conclusion of the survey.

Relying on *Warner Bros., Inc. v. American Broadcasting Cos., Inc.,* 720 F.2d 231, 245 (2nd Cir.1983), Defendants argue that the Court shall decide as a matter of law that its allegedly infringing use of the trademark is not confusingly similar and that once such a determination has been made the conclusion should not be altered by survey evidence. The Court cannot agree. *Warner Bros.* was a copyright case in which similarity or copying was the primary issue. As the Court of Appeals for the First Circuit stated in *Pignons,* however, "[c]onfusion over the nature of the parties' business relationship may be as objectionable for purposes of trademark infringement as is confusion between their goods." *Pignons,* 657 F.2d at 490. Surveys seem a particularly apt manner of assessing this aspect of a *trademark* infringement claim.

■ Defendants also suggest in their reply memorandum that the survey is flawed in its methodology. They argue, for example, that the survey did not necessarily reflect confusion in the minds of any relevant consumers, namely Bean customers or prospective customers. Bean's submissions indicate, however, that their customers fall, in varying percentages, into all economic groups and that over 25% of all households in the United States receive a

Christmas mailing from them. It appears to the Court that a shopping mall intercept would have some overlap with Bean's prospective customers since Plaintiff avowedly is trying to expand its market from its already large base. Moreover, with the O'Reilly affidavit, Plaintiff has provided support for the survey's methodology and results. Defendants have not yet presented anything substantive attacking the approval of the study and the Court is unprepared to find the study inadmissible on the basis of Defendants' vague suggestions. Therefore, viewing the evidence in the light most favorable to the nonmoving party, the Court finds that Plaintiff has shown some evidence of actual confusion.

In considering some of the other factors mentioned in *Pignons,* the Court notes that Plaintiff has submitted affidavit evidence indicating that its trademarks are very strong and valuable. Defendants' intent in imitating the mark appears, from the description of the sex catalog in the magazine's table of contents, to be an intent to parody or satirize. Plaintiff disputes this characterization of Defendants' intent, pointing to certain testimony of Drake's employees. It is not necessary to examine the other factors to see that there exist genuine issues of material fact on the issue of likelihood of confusion, an essential element of any trademark infringement claim. These issues must be resolved at trial. Thus, both parties' motions for summary judgment on Count II must be denied.

### Count III

Count III of the Complaint seeks relief under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides:

Any person who shall ... use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action ... by any person who be-

lieves that he is or is likely to be damaged by the use of any such false description or representation.

Defendants argue that in the First Circuit two essential elements of a section 43(a) claim are competition between the parties and likelihood of confusion by the alleged infringer's use of the owner's mark. Defendants cite *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366 (1st Cir. 1980), as establishing that the parties must be competitors for plaintiff to state a claim under section 43(a). In *Rovira* the Court of Appeals stated that section 43(a) "creates a federal law of unfair competition by providing a statutory remedy to a party aggrieved by a competitor's 'false designation of origin' of his product even though he does not have a federally registered trademark." *Id.* at 372.

The Court does not construe the First Circuit's words in *Rovira* as creating a requirement that the parties be in direct competition. In the more recent case of *Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 561 (1st Cir.1982), the Court elaborated on the remedy provided by section 43(a):

> It is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark by means of confusingly similar marking and packaging, which would create the impression that the products of the defendant originated with the plaintiff. Again, a showing that the marks or packaging of defendant's create a likelihood of confusion with the products of the plaintiff will be a key to

establishing a claim of false designation of origin.

The protection of goodwill afforded by section 43(a) extends to "any person damaged by the use of any such false description or representation." 15 U.S.C. § 1125(a); *Pignons*, 657 F.2d at 493. Persons can be damaged by appropriation of their trademarks and the goodwill associated therewith whether or not they are in direct competition with the alleged infringer. The broad language of the statute, providing a remedy to "any person" appears to recognize this and other courts have so held in cases similar to this one. *See, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366, 374 (S.D.N.Y.1979); *aff'd* 604 F.2d 200 (2d Cir. 1979); *St. Charles Mfg. Co. v. St. Charles Furniture Corp.*, 482 F.Supp. 397 (N.D.Ill. 1979). The Court finds, therefore, that direct competition is not a necessary element for a claim brought under section 43(a). It is enough to state a claim in this case that Plaintiff advertises in magazines and Defendant is a magazine displaying its colorable imitation of Plaintiff's marks in the format of a magazine advertisement.[1] Since a genuine issue of material fact exists on the element of likelihood of confusion, summary judgment is inappropriate for either party on Count III.

*Count IV*

Count IV sets forth a claim for unfair competition under the common law. Defendants assert that they are entitled to summary judgment because likelihood of confusion is an essential element of such an action. The Court has already deter-

---

**1.** The Court in *Coca Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972) aptly discussed the relevance of competition in an action brought under § 1114(a) of the Lanham Act:

> Admittedly the parties are not in competition in the ordinary sense. "But recognition ... that [defendant is] not making infringing sales of a kind of goods that plaintiff sells under a trade mark, does not end the matter." *Hobart Manufacturing Company v. Kitchen Aid Service, Inc.*, 260 F.Supp. 559, 561 (E.D.N.Y.1966). Here there is no question that both are seeking to attract public attention and patronage for their respective products by the

> graphic display of a distinctive and widely known trademark. That trademark belongs to and is uniquely identified with plaintiff and its products. Plaintiff's property right in its mark clearly extends to its reproduction and publication in advertising and for other promotional uses regarding its products. In this case defendant's product—a simulated bill poster—is itself one of the common forms of advertising utilized by plaintiff.

Similarly, in this case the record shows that Plaintiff advertises in magazines and Defendants' Sex Catalog is in the format of a magazine advertisement.

mined that a genuine question of fact exists on that issue.

### Count V

■ The complaint also alleges a violation of Maine's Deceptive Trade Practices Act, 10 M.R.S.A. § 1212. The Court agrees with the Defendants that likelihood of confusion must be proved before violation of that statute can be established. Because a genuine issue of material fact remains on the issue of likelihood of confusion, summary judgment is inappropriate.

### Count I

Count I seeks relief under the Maine trademark dilution statute, 10 M.R.S.A. § 1530. That statute provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter ... shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

This statute has not been recently construed by the Law Court. The Court of Appeals for the First Circuit construed an identical Massachusetts statute in *Pignons*. The Court stated that for a plaintiff to sustain an action under the statute, it must show that its mark is distinctive and that defendant's use of a similar mark has created the likelihood of dilution. *Pignons*, 657 F.2d at 483, 494. Plaintiff has submitted undisputed evidence that its mark is distinctive and strong.

The Court in *Pignons* pointed out, and Defendants have acknowledged, that there are generally three interpretations given to the term trademark dilution. One refers to the injury to the mark caused by actual or potential consumer confusion. *Pignons*, 657 F.2d at 494. As has been discussed previously, there remains a genuine issue of fact on this issue; thus summary judgment is inappropriate on this theory.

■ Trademark dilution also has been defined as use of a mark by defendant in a

way that detracts from, draws on or otherwise appropriates the goodwill and reputation associated with the plaintiff's mark. *Id.* Defendants argue that the statute cannot reasonably be construed to encompass literary satires and that the L.L. Beam catalog was intended solely as such a satire. For this proposition, Defendants rely on *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785 (E.D.N.Y.1983), in which the plaintiff sought relief under New York's antidilution statute, *inter alia,* for defendant's inclusion in its Wacky Package of a child's sticker in the form of a Tetley Tea box, bearing the mark Petley Flea Bags. The Court in *Tetley* denied the injunction, stating that plaintiff had offered no proof that its mark was truly distinctive or that anyone would reach the conclusion that the parody would result in images of impurity in the minds of its customers. Such connotations would obviously tarnish the affirmative associations the mark had come to convey. *Tetley*, 556 F.Supp. at 794. Plaintiff's failure to present evidence on the critical issues permitted the court to find that "the broad humor defendant employs serves to prevent the type of blurring which might result from a more subtle or insidious effort at humor at plaintiff's expense." *Id.* at 794. It is clear that parody *per se* is not protected from injunction under the antidilution statute. Evidence of the effect of the attempted parody is critical.

■ In this case, Plaintiff has presented evidence of the likelihood its mark will be tarnished by the L.L. Beam Sex Catalog. The affidavit of Richard T. O'Reilly, a consultant to corporations and advertising agencies on marketing and advertising, states:

9. ...

The image of L.L. Bean is clean, wholesome, and outdoorsy in contrast to *High Society* magazine and the use of L.L. Beam in the magazine. In my opinion, *High Society* used the name because of the high quality image of the L.L. Bean name and used the look-

alike association to make the Sex Catalog more attention-getting.

10. The coarse and tawdry products shown in the Six [sic] Catalog, which many of survey respondents (including a significant number that were not confused) associated with L.L. Bean is totally opposite to the high quality image which L.L. Bean seeks to maintain. The magazine as a whole conveys a message of coarseness and baseness which is opposite to L.L. Bean's image....

11. In my experience, the trademarks "L.L. Bean" and "Bean's" are among the best known and highly regarded trademarks in the retail field.... *Any* negative association with L.L. Bean is significant, for which the company would necessarily and justifiably have deep concern, because it is essential to maintain the high quality, strongly favorable image the name possesses with the public.

12. It is my opinion, based on forty years of experience in the marketing and advertising of consumer products, that L.L. Bean's trademark and name has been damaged, through the publication of the L.L. Bea*m* Sex Catalog by *High Society* magazine.

....

Plaintiff also has submitted the affidavit of Seth M. Siegel, vice president of a New York trademark licensing company. In paragraph 10 of the affidavit, Siegel states:

Adverse associations, such as that between L.L. Bean and *High Society* magazine endanger the integrity and strength of the mark. An authorized use by *High Society* would create a different market awareness of L.L. Bean from that which it has developed and maintained in the past.

These factual assertions by Plaintiff remain undisputed by Defendants. In *Tiffany and Co. v. Boston Club, Inc.*, 231 F.Supp. 836 (D.Mass.1964), the court granted an injunction under the Massachusetts antidilution statute where the evidence showed that the name Tiffany was associated with quality and defendants had used the name Tiffany's in conjunction with a radio program which was "really terrible," "boring" and "stunk." *Id.* at 844. The court stated that "the program presented graphic evidence of the risks of tarnishment to which a party in the position of plaintiff is exposed if his valuable trade name is put beyond his own control and subjected to the vagaries of a stranger's business." *Id.* It is clear, then, that Plaintiff has made out a case for the injunctive relief provided by Maine's antidilution statute, 10 M.R.S.A. § 1530.

■ Defendants contend, however, that any such injunctive relief would violate their first amendment rights. That argument was thoroughly addressed in *Dallas Cowboy Cheerleaders*, where the court affirmed the granting of a preliminary injunction against the showing of a movie depicting actresses in uniforms like plaintiffs' performing a variety of sexual acts:

Plaintiff's trademark is in the nature of a property right, ... and as such it need not "yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist." *Lloyd Corp. v. Tanner*, 407 U.S. 551 [92 S.Ct. 2219, 33 L.Ed.2d 131] ... (1972). Because there are numerous ways in which defendants may comment on "sexuality in athletics" without infringing plaintiff's trademark, the district court had not encroached upon their first amendment rights in granting a preliminary injunction....

For similar reasons, the preliminary injunction did not constitute an unconstitutional "prior restraint." This is not a case of government censorship, but a private plaintiff's attempt to protect its property rights. The propriety of a preliminary injunction where such relief is sought is so clear that courts have often issued an injunction without even mentioning the first amendment.... The prohibition of the Lanham Act is content neutral ..., and therefore does not arouse the fears that trigger the applica-

tion of constitutional "prior restraint" principles.

*Dallas Cowboy Cheerleaders, Inc.,* 604 F.2d at 206 (citations omitted).

Similarly, the Constitution would not be offended by the grant of an injunction to prevent trademark dilution. As the court stated in *Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 859 (C.D.Cal.1985):

> The state has a strong interest in protecting distinctive trademarks from harmful uses by business competition, even in the absence of confusion.... If injunctive relief were not available to prevent dilution of a trademark "then any unauthorized reproduction of a trademark or mark would be without remedy." *Coca Cola Co.,* 346 F.Supp. 1183 (E.D.N.Y.1972).

The Court will, therefore, issue an appropriate injunction on Plaintiff's antidilution claim.

### Count VI

In Count VI Plaintiff seeks relief for Defendants' alleged interference with Plaintiff's prospective business advantage. In light of the Law Court's recent decision in *DiPietro v. Casco Northern Bank,* 490 A.2d 215 (Me.1985), Plaintiff does not oppose Defendants' motion for summary judgment on this count. Having examined *DiPietro,* the Court is satisfied that Defendants are entitled to summary judgment as a matter of law. In that case the Law Court indicated that any extension of decisional law concerning the tort of interference would likely include the element of fraud or intimidation. Plaintiff in this case has alleged neither.

### Count VII

In Count VII Plaintiff seeks relief for trade libel, alleging that Defendants' publication of the sex catalog has caused Plaintiff to be scorned and ridiculed by virtue of its wrongful association with Defendants' magazine. In its brief, Plaintiff argues that it "is entitled to compensation when its goodwill and trade names have been, through no fault of its own, exposed to unseemly associations." Plaintiff's memorandum at 39–40. As support for this assertion, Plaintiff relies primarily on *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F.Supp. 1219 (D.Colo. 1976). In *Big O,* the Court discussed the extension of defamation law to the protection of property interests such as trademarks and goodwill:

> Initially recovery was limited to falsehoods injurious to the ownership of land. More recently recovery was recognized for any injury to personal property and to any interference with the plaintiff's business resulting in some form of customer diversion. The word "disparagement" has been used to describe these various kinds of interference with commercial or economic relations through injurious falsehood.

*Id.* at 1234.

Since Plaintiff's claim for trade libel is essentially the same as a claim for tortious interference with commercial or economic relations, *id., see also* W. Prosser, *The Law of Torts* at 915–16 (1971), Count VII fails to state a claim. Although Plaintiff cites *Tillson v. Robbins,* 68 Me. 295 (1878), a Maine case discussing defamation of a person in his business, it is clear from its submission that it is in fact alleging injury to its trademarks and goodwill. As Prosser states in his discussion of the tort which he terms injurious falsehood: "Because of its ancient, left handed association with defamation, the kind of interference by falsehoods which are not personally defamatory, and yet cause pecuniary loss, has for some centuries been regarded as a more or less distinct tort in itself." Prosser, at 915. As was stated previously, and as Plaintiff apparently conceded, it has not alleged the requisite elements of the tort of interference under Maine law. *DiPietro v. Casco Northern Bank,* 490 A.2d 215.[2]

---

2. An element of malice, similar to the fraud or intimidation element in Maine, is required to make out the tort of disparagement or trade libel discussed in *Big O. See Big-O,* 561 F.2d 1365 (10th Cir.1977).

Accordingly, it is ORDERED that Plaintiff's and Defendants' cross-motions for summary judgment be, and they are hereby, DENIED on Counts II, III, IV and V. Defendants' motion for summary judgment on Counts VI and VII is GRANTED, and Counts VI and VII are hereby DISMISSED. Finally, Plaintiff's motion for summary judgment on Count I is GRANTED. Defendant is enjoined under 10 M.R. S.A. § 1530 from again publishing the "L.L. Beam Sex Catalog," or further distributing the "L.L. Beam Sex Catalog" contained in the October 1984 issue of *High Society* magazine or making any other use of facsimiles of L.L. Bean's trademarks.