**UNIVERSAL CITY STUDIOS, INC. and Merchandising Corporation of America, Inc., Plaintiffs,**

v.

**The T–SHIRT GALLERY, LTD., Ra Productions and Bob Edelson, Defendants.**

No. 85 Civ. 7126 (JES).

United States District Court, S.D. New York.

May 19, 1986.

Evan L. Gordon, New York City, for plaintiffs.

Kazlow & Kazlow, New York City, for defendants; Amos Weinberg, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiffs, the producer and licensing agent of the "Miami Vice" television series, seek a preliminary injunction enjoining defendants from selling "Miami Mice" t-shirts.[1] Plaintiffs seek relief primarily on the grounds that the defendants have violated New York's unfair competition law relating to misappropriation. Alternative-ly, plaintiffs argue that the defendants have violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982).

The Court has received briefs from both parties and has held an evidentiary hearing. At the hearing, the Court viewed excerpts from the "Miami Vice" television series, heard testimony from several witnesses, and accepted into evidence various exhibits relating to both the t-shirts and the television series. After considering all the evidence and arguments of counsel in this action, the Court concludes that plaintiff's application for a preliminary injunction must be denied for the reasons set forth *infra.*

## FACTS

Plaintiff Universal City Studios Inc. ("Universal") is the producer of the television series "Miami Vice." Universal holds a copyright on the series and has also applied for a trademark registration for the logo "Miami Vice." *See* Transcript of Hearing ("Tr.") at 20–21; Pl. Ex. 25 & 26. This logo is displayed at the beginning of every "Miami Vice" show and is printed in stylized block letters with the word "Miami" above the word "Vice."

Plaintiff Merchandising Corporation of America, Inc. ("Merchandising") is the exclusive merchandising arm of Universal and grants licenses to manufacturers and distributors, authorizing them to produce various products relating to the "Miami Vice" television series. *See* Tr. at 20. Approximately fifteen such merchandising licenses have already been issued for "Miami Vice" products. These licenses cover a variety of products, including t-shirts. *See id.* at 21–22.[2]

It is undisputed that "Miami Vice" is one of the most popular shows on television today. The show revolves around two main characters, Detective Sonny Crockett, who is white, and Detective Ricardo Tubbs, who is black. These detectives battle

---

**1.** Plaintiffs also seek a permanent injunction against defendants and damages for all profits earned by defendants from their sale of "Miami Mice" t-shirts. *See* Complaint at pp. 5–6. The sole issue addressed in this Opinion and Order is whether the preliminary injunction should be granted.

**2.** At the evidentiary hearing, neither party introduced any evidence as to what these various products looked like.

against drug smugglers, mob bosses, and many other evil criminal figures. Plaintiffs' exhibits, a collection of articles about "Miami Vice," as well as selected videotaped segments from the series, establish that the show's major themes are crime and violence, with sexual overtones thrown in. *See* Pl. Ex. 1–21.

"Miami Vice" is promoted as a highly stylized television series with an art deco, flashy look. *See* Tr. at 5, 11. Pastel color patterns predominate on the filming set; earth tones are never permitted. *See id.* at 8. Crockett and Tubbs wear fashionable clothing in tropical pastel colors, adding to the overall style of the show. Crockett generally wears a single-breasted jacket, collarless shirt, and pants with no belt. *See id.* at 6. Tubbs, on the other hand, tends to wear a notch-collar shirt, a thin tie, and a double-breasted suit. *See id.* at 7. Finally, one of the most important elements in the overall style of the show is that the music and lyrics of popular rock-and-roll songs are blended into the action on the set and take the place of extended dialogue. *See id.* at 8.

Defendant T-Shirt Gallery ("the Gallery") manufactures and distributes, *inter alia,* five different types of "Miami Mice" t-shirts, and holds a New York State trademark and a federal copyright for the cartoon drawings of "Miami Mice."[3] *See* Tr. at 68; Def.Ex. B & C. Each of the t-shirts has the words "Miami Mice" printed across the top of the t-shirt in non-stylized block letters over a diamond shaped design. The words "T-Shirt Gallery" are printed near the bottom of the shirts.

Each of the t-shirts features two comical cartoon mice, who wear sun glasses and dress in clothing similar to the costumes of Crockett and Tubbs. Thus, one mouse, who has an "Afro" hairstyle, is wearing a double-breasted suit (as does Tubbs) while the other mouse wears a t-shirt and a single breasted suit (as does Crockett). Furthermore, the t-shirts depict these mice in various settings: on a beach, in New York City, leaning against an expensive sports car, and at a dance club. *See generally* Pl. Ex. 27. Plaintiffs allege these settings correspond to typical settings in the Miami Vice television series. *See* Plaintiffs' Post Hearing Brief at 4. Finally, the clothing of the mice, the "Miami Mice" logo, and any buildings or cars appearing in the t-shirts, are all generally colored in with pastel colors.

Defendant Bob Edelson is a merchandising agent for the Gallery. *See* Tr. at 36.[4] According to Edelson's deposition, Edelson and Markku Anunio, a.k.a. "Finn," the president of the Gallery, had an informal verbal agreement that Edelson would get 25% of the profits from any merchandising deals he arranged for "Miami Mice" products. *See* Tr. at 36. Pursuant to that agreement, Edelson sent a letter dated August 8, 1985, to Universal in which he offered to seek the "movie-TV-merchandising rights" to "Miami Mice." In the letter, Edelson explained that "Miami Mice is an animated parody of Miami Vice," and that he thought Universal would have the resources to develop it "into a sophisticated animated crime-fun TV show." Universal replied by filing the present action.

## ANALYSIS

A preliminary injunction is proper only when the plaintiff establishes possible irreparable injury, plus either (a) probability of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiffs' favor. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206–07 (2d Cir.1979); *see also Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir.1973).

■ In cases which involve unfair competition and Lanham Act claims, irreparable injury will be presumed if the plaintiffs

---

**3.** There is no dispute that plaintiffs' copyright and their application for trademark registration pre-date defendants' copyright and New York State trademark registration. *See* Pl. Ex. 25 & 26; Def. Ex. B & C.

**4.** RA Productions, the other defendant in this action, appears to simply be a business name for Bob Edelson. *See* Tr. at 31.

first establish a probability of success on the merits. *See American Home Products v. Johnson Chemical Co.*, 589 F.2d 103, 106 (2d Cir.1978); *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F.Supp. 980, 989–990 (S.D.N.Y.1980); *see also Standard & Poor's Corp. v. Commodity Exchange*, 683 F.2d 704, 708 (2d Cir.1982) (in Lanham Act claim, a showing of likelihood of confusion, which is an essential element of success on the merits, will also establish the requisite risk of irreparable harm); *cf., Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977) (court may presume irreparable injury in copyright infringement action if *prima facia* case of infringement is made out). Thus, the Court will first discuss whether the plaintiffs have demonstrated a probability of success on the merits before turning to the issues of irreparable injury and balance of hardships.

## I. PROBABILITY OF SUCCESS ON THE MERITS

### A. *New York Unfair Competition Claim*

█ Plaintiffs' principal argument offered in support of their application for a preliminary injunction is that the defendants have violated the misappropriation branch of New York's unfair competition law. The New York law of unfair competition is a "broad and flexible doctrine" encompassing "any form of commercial immorality." *See Roy Export Co. v. Columbia Broadcasting System*, 672 F.2d 1095, 1105 (2d Cir.) (quoting *Metropolitan Opera*

*Assoc. v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 792–96, 101 N.Y.S.2d 483, 488–93 (Sup.Ct.1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1951) (per curiam), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)). The misappropriation branch of New York's unfair competition law generally concerns the taking and use of the plaintiff's property to compete against the plaintiff. *See id.; see also International News Service v. Associated Press*, 248 U.S. 215, 239, 39 S.Ct. 68, 63 L.Ed. 211 (1918). Thus, a defendant can be liable for unfair competition if he misappropriates the "skill, expenditures, and labors of a competitor." *See Flexitized, Inc. v. National Flexitized Corporation*, 335 F.2d 774, 781 (2d Cir.1964) (quoting *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.S.2d 556, 567, 190 N.Y.S.2d 977, 986, 161 N.E.2d 197, 203 (1959)).

In this case, plaintiffs argue that defendants have misappropriated from the Miami Vice show; (a) the settings, (b) the style, dress and essential expressions of the lead characters, (c) the color patterns and (d) the title. *See* Plaintiffs Post-Hearing Brief at 4, *see also Tr.* at 53.[5] Plaintiffs, however, have failed to establish a probability of success on the merits on this claim because this claim is preempted by the federal copyright laws. *See* 17 U.S.C. § 301 (1982); *see also Warner Bros. v. American Broadcasting Co.*, 720 F.2d 231, 247 (2d Cir. 1983)[6].

█ Under § 301, a state law claim is preempted by the federal copyright laws if

---

**5.** Plaintiffs contend that the elements allegedly misappropriated from "Miami Vice" constitute the mise-en-scene of the television series. *See* Plaintiffs' Post-Hearing Brief at 4. According to plaintiffs, the mise-en-scene is an essential element of the style, as opposed to the narrative portion, of a motion picture. According to plaintiffs, the general aspects of the mise-en-scene are: (1) setting, (2) costume, (3) lighting, and (4) figure expression and movement. *See id.* at 3.

**6.** 17 U.S.C. § 301 provides, in relevant part:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium

of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or

(2) any cause of action arising from undertakings commenced before January 1, 1978; or

two conditions are satisfied: (1) the subject matter of the work in which the state law rights are asserted comes within the subject matter of the copyright laws; and (2) the state law rights asserted in the work are equivalent to the exclusive rights protected by the federal copyright laws. *See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds,* —— U.S. ——, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1531 (S.D.N.Y.1985); 1 M. Nimmer, *Nimmer on Copyright* ("Nimmer") § 1.01[B], at 1–9. The first condition under § 301 is clearly satisfied here because the "Miami Vice" television series comes within the subject matter of federal copyright. The subject matter of copyright consists of any "original works of authorship fixed in any tangible medium of expression" and includes "motion pictures and other audiovisual works." *See* 17 U.S.C. § 102(a) (1982). Indeed, plaintiffs have argued in this action that they have a valid copyright for the "Miami Vice" television series. *See* Tr. at 20–21.[7]

Turning to the second condition for federal preemption under § 301, a state law cause of action is preempted only if the state law creates rights that are "equivalent to any of the exclusive rights within the general scope of copyright." *See* 17 U.S.C. § 301(b)(3). A state right is equivalent to copyright if the state right "is infringed by the mere act(s) of reproduction,

performance, distribution or display." *See Mayer supra*, 601 F.Supp. at 1535 (quoting Nimmer, *supra*, § 1.01[B][3], at 1–11–12). On the other hand, if the state law violation requires an extra qualitative element beyond those acts, preemption will not apply. *See Harper & Row, supra*, 723 F.2d at 200; Nimmer, *supra*, § 1.01[B] at 1–12. Since the unfair competition complained of here consists simply of the misappropriation and reproduction of the style and characters of plaintiffs' television series into t-shirt form, the second condition under § 301 is satisfied and plaintiffs' New York unfair competition claim is preempted. *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir.1986); *Warner Bros., supra*, 720 F.2d at 247; *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918–19 (2d Cir.1980); *Mayer, supra*, 601 F.Supp. at 1535–36; *Giangrasso v. CBS*, 534 F.Supp. 472, 478 (E.D.N.Y.1982).

Plaintiffs argue, however, that their claim of unfair competition includes allegations of commercial immorality and an unjustifiable attempt to profit from the efforts of another, *see e.g., Metropolitan Opera Assoc., supra*, 199 Misc. at 792–96, 101 N.Y.S.2d at 488–93, which are additional elements to their cause of action negating preemption. *See* Plaintiffs' Supplemental Memorandum of Law at 4. This argument is not persuasive. As Judge Leisure noted in *Mayer, supra*, 601 F.Supp. at 1535, commercial immorality is not an extra element of the cause of action for misappropriation

---

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

7. Plaintiffs argue that since the defendants allegedly misappropriated the title to the "Miami Vice" series, and a title is not copyrightable, *see generally, Nimmer, supra*, § 2.16, at 2–186, the subject matter of the work in which the state law rights are asserted is not within the subject matter of federal copyright. *See* Plaintiffs' Supplemental Memorandum of Law, at 2. The Court is not persuaded by this argument. This argument is completely at odds with plaintiffs' assertions throughout these proceedings that the defendants have misappropriated the entire essence of the "Miami Vice" television series, a copyrighted work. *See, e.g.,* Tr. at 53; Plaintiffs' Post-Hearing Brief, at 3–4. Moreover, the mere

fact that portions of the "Miami Vice" television series may consist of uncopyrightable material does not take the work as a whole outside of the subject matter protected by the Copyright Act and therefore does not avoid preemption. *See Harper & Row, supra*, 723 F.2d at 200.

The Court also finds no merit in plaintiffs' argument that preemption does not apply because defendants are unfairly competing with plaintiffs' licensing program, which cannot be copyrighted. *See* Plaintiffs' Supplemental Memorandum of Law, at 4. The gravamen of plaintiffs' state law claim is the misappropriation of plaintiffs' copyrighted television series. At best, any harm done to plaintiffs' licensing program represents additional damages flowing from the misappropriation claim. The strictures of § 301 cannot be circumvented merely by characterizing these potential additional damages as a separate unpreempted claim.

under New York law, but merely a label attached to the alleged infringing conduct. The use of that label in no way detracts from the fact that the misappropriation claim seeks to protect the same rights which the federal copyright laws are designed to protect. To hold otherwise would allow the state to provide a cause of action for the same conduct which may be protected under federal copyright laws, merely because the state deems the conduct "unfair" or "immoral." Such an interpretation would clearly circumvent Congress' purpose in enacting § 301 to "avoid the development of any vague borderline areas between State and Federal protection." *See Harper & Row, supra,* 723 F.2d at 200 (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 130, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5746).[8]

## B. *Lanham Act Claim*

 Plaintiffs argue in the alternative that defendants have violated section 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a), by "intend[ing] to take advantage of plaintiffs' efforts and to deceive the public into believing that the [t-shirts] are either authorized by or connected with the plaintiffs and the television series." Plaintiff's Memorandum of Law, at 7.[9] To succeed in an action for trademark infringement or unfair competition under section 43(a), plaintiffs must establish a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or confused as to the source or sponsorship of the goods in question. *See Universal City Studios, Inc. v. Nintendo Co.;* 746 F.2d 112, 115 (2d Cir.1984), *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Polaroid Corp. v. Polaroid Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In determining whether there is a likelihood of confusion, the Court must consider, *inter alia:* (1) the strength of plaintiffs' mark, (2) the

---

**8.** *Roy Export Co. v. Columbia Broadcasting System,* 503 F.Supp. 1137 (S.D.N.Y.1980) *aff'd* 672 F.2d 1095 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) cited by plaintiffs, is not applicable to the present case. In that case, the district court held that federal copyright law did not preempt plaintiffs claims under New York law for unfair competition. While stating that "the question is not easy," the *Roy Export* court held that there was no preemption because New York's law required a finding of commercial immorality or unfairness based on additional evidence of bad faith not required under the copyright laws. *Id.* at 1151–52. In the alternative, however, the district court also found that the plaintiffs' unfair competition claim was not preempted because the claim was based substantially on the taking of a work not within the subject matter of the copyright laws. *Id.* at 1152. The Second Circuit affirmed but only on the basis of this second ground, specifically refusing to consider the first ground. *See* 672 F.2d at 1106 & n. 19.

Moreover, the district court's decision in *Roy Export* is not applicable here because it was decided under the law applicable prior to the effective date of § 301. Thus, the district court in *Roy Export* did not consider whether these were "rights equivalent to copyright" but rather whether the state law was "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," which was the applicable law at that time. *See* 503 F.Supp.

at 1151 (citations omitted). Finding that the state law complemented rather than conflicted with federal law, the district court found no preemption. *Id.*

**9.** It is not disputed that section 43(a)'s protections "extend to the specific ingredients of a successful T.V. series," and that therefore section 43(a) applies to the "broad spectrum of marks, symbols, design elements and characters which the public directly associates" with the "Miami Vice" series. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981); *see also, DC Comics, Inc. v. Filmation Associates,* 486 F.Supp. 1273, 1276–77 (S.D.N.Y.1980). Moreover, even though plaintiffs have only applied for trademark registration for the logo "Miami Vice," plaintiffs' common law trademarks in the "Miami Vice" series remain protectable under the Lanham Act, *see Dallas Cowboys, supra,* 604 F.2d at 203 n. 3 (2d Cir.1979), so long as those marks have acquired a secondary meaning. *See Mattel, Inc. v. Azrak-Hamway Int'l., Inc.,* 724 F.2d 357, 360–61 (2d Cir.1983) (per curiam); *Dallas Cowboys, supra,* 604 F.2d at 203 & n. 5.

Neither party has briefed the issue of whether plaintiffs' trademarks have acquired a secondary meaning. Given the Court's holding *infra* that plaintiffs have not established a probability of success that there will be a likelihood of consumer confusion, the Court need not reach the secondary meaning issue.

proximity of the products; (3) the sophistication of the likely consumers; (4) the degree of similarity between plaintiffs' and defendants' marks; (5) evidence of actual confusion; and (6) defendants' good or bad faith in adopting the marks. *See Nintendo, supra,* 746 F.2d at 116; *Polaroid Corp., supra,* 287 F.2d at 495.

The first two factors listed above tend to somewhat favor plaintiffs' position. Thus, defendants do not dispute the popularity of plaintiffs' television series. Furthermore, it is undisputed that there is a proximity between the products, at least in so far as plaintiffs' licenses for t-shirts have the potential for competition with the "Miami Mice" t-shirts. As to the third factor, the sophistication of the likely consumers, this appears to be a neutral factor given that neither party has presented any evidence on this issue.

Both the fourth and fifth factors, however, favor defendants' position and tip the balance against the issuance of a preliminary injunction. While there are similarities between the "Miami Mice" t-shirts and the "Miami Vice" television series, *i.e.,* the titles,[10] the casual dress of the characters, the pastel colors, and the various beach and dance club scenes, the Court concludes that the t-shirts and the television series are not sufficiently similar to warrant a finding of a likelihood of consumer confusion. In determining whether a likelihood of consumer confusion exists, it is proper for the Court to compare the "total concept and feel" of the two works. *See Nintendo, supra,* 746 F.2d at 116.[11] In "Miami Vice," the two lead characters are portrayed as tough, courageous, and stylish detectives who fight against notoriously evil criminal figures. The major themes of "Miami Vice" are adult themes of crime, violence, and sex. As one of plaintiffs' exhibits described the television series, "Miami Vice" is "the most intensely serious cop show on TV." *See* Pl. Ex. 1 (*Time,* September 16, 1985, at 61). In contrast, the "Miami Mice" t-shirts lightheartedly focus on two comical mice who do not at all resemble the detectives in "Miami Vice" and who do not evoke the themes of crime and violence.[12]

Moreover, the t-shirts' mouse-like characters, coupled with the title "Miami Mice," clearly parody the serious, highly stylized nature of the television series. The strength of this parody highlights the differences between the two products and should further dispel any confusion on the part of consumers that plaintiffs manufactured, authorized sponsored, or were in any way connected with the t-shirts. *See Nintendo, supra,* 746 F.2d at 116; *cf. Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 790 (E.D.N.Y.1983). In sum, the Court concludes that the conceptual

---

10. The Court notes that while the titles are somewhat similar, the "Miami Mice" logo on the t-shirt is very different from the "Miami Vice" logo. The "Miami Vice" logo is written in stylized block letters with the word "Miami" above the word "Vice." The t-shirt logo, however, has the words "Miami Mice" written side-by-side in non-stylized block letters. Moreover, the words "Miami Mice" are printed over a diamond-shaped design which does not appear in connection with the "Miami Vice" logo. Given these differences, the Court does not find the logos to be confusingly similar. *Accord, Universal City Studios v. Casey & Casey,* 622 F.Supp. 201, 205 (D.C.Fla.1985).

11. In *Nintendo* the alleged holder of the trademark for "King Kong" sued the manufacturer of the video game "Donkey Kong" under section 43(a) of the Lanham Act. The Second Circuit granted summary judgment for the defendants in part because the "farcical, childlike and nonsexual" nature of the Donkey Kong character and game was so different from the King Kong story of the "ferocious gorilla in question of a beautiful woman" that there could be no likelihood of confusion as a matter of law. *See Nintendo, supra,* 746 F.2d at 116–17 (quoting district court's findings of fact in 578 F.Supp. 911, 928 (S.D.N.Y.1983)).

12. One of defendants' t-shirts, entitled "Mice Land" on defendants' order form, does depict the themes of crimes of violence. That t-shirt depicts a shark pointing a machine gun at a bikini-clad mouse who is standing on a pier, while the two Miami Mice have their guns drawn. This t-shirt, however, like the defendants' other t-shirts, at best parodies the television series and the Court is not convinced that consumers will be confused that plaintiffs' manufactured or authorized this t-shirt. *Cf., Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 790 (E.D.N.Y.1983). Moreover, the Court notes that plaintiff has never requested that the Court enjoin only this "Mice Land" t-shirt.

differences between defendants' t-shirts and the plaintiffs' television series cast sufficient doubt on whether a likelihood of consumer confusion exists, such that the Court cannot find that plaintiffs have established a probability of success on the merits of their Lanham Act claim.

This conclusion is in substantial accord with a decision rendered by Judge Aronovitz in the Southern District of Florida, which denied these same plaintiffs' motion for a preliminary injunction against another producer of "Miami Mice" t-shirts. *See Universal City Studios v. Casey & Casey, Inc.,* 622 F.Supp. 201 (S.D.Fla.1985). The "Miami Mice" t-shirts in *Casey* were very similar to the defendants' t-shirts in this action.[13] In *Casey,* the Court concluded that the "cartoon depiction of two mouse-like figures, attired in casual dress clothing similar to the fashions favored by the two leading characters in the 'Miami Vice' series," were not sufficiently similar to plaintiffs' television series and related products to warrant a preliminary injunction. *See id.* at 205. Moreover, in connection with a claim for copyright infringement raised by plaintiffs' complaint in that action, the *Casey* court noted that the t-shirts and the television series were not substantially similar. This finding was based in part on Judge Aronovitz's observation that the comical mice clearly differed from the "Miami Vice" characters who plaintiffs portrayed "as the embodiment of style, courage, and determination." *See id.* at 206.

■■■ The Court's conclusion that plaintiffs in the instant action have failed to establish a probability of success on the

merits of their Lanham Act claim is bolstered by the absence of any survey evidence indicating that consumer confusion actually occurred. Although the plaintiffs need only demonstrate a likelihood of confusion and not actual confusion to warrant equitable relief, *see Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir. 1981), the Court may properly infer that there is no likelihood of consumer confusion from this absence of survey evidence. *See Tetley, Inc., supra,* 556 F.Supp. at 791. This is especially true where, as here, a likelihood of confusion is not obvious due to substantial dissimilarities between the products. *See, e.g., Nintendo, supra,* 746 F.2d at 117; *Mattel, Inc. v. Azrak-Hamway, Int'l., Inc.,* 724 F.2d 357, 361 (2d Cir.1983) (per curiam).

■■■ Plaintiffs argue, however, that the defendants in bad faith deliberately copied plaintiffs' marks and that the Court should presume a likelihood of confusion from this conduct. *See* Plaintiffs' Memorandum of Law, at 5. The Second Circuit has recognized that evidence of intentional copying raises a presumption that the second comer intended to create consumer confusion and succeeded. *See Warner Bros., supra,* 720 F.2d at 246–47. While it is clear that the defendants were influenced by the "Miami Vice" television series, *see* Tr. at 69–71, and that defendants expected that the success of the t-shirts would, in part, be attributable to the popularity of the television series, *see id.* at 38–39, 45, the evidence does not support plaintiffs' argument that the defendants copied plaintiffs' marks with the intent to create consumer confusion.[14] Since de-

---

**13.** The parties have supplied the Court with a sample t-shirt from the *Casey* action. That t-shirt has the words "Miami Mice" written in stylized block letters across the top of the shirt. The t-shirt depicts two mice, one white and one black, who are dressed in pastel outfits similar to the clothing worn by the "Miami Vice" characters. Moreover, the *Casey* t-shirts depict the mice leaning against a pastel-colored sports car.

**14.** Plaintiffs rely on several letters by the defendants to establish bad faith and intentional copying. The first letter was the August 8, 1985 letter, in which Edelson invited Universal to participate in the creation of an animated television show based on "Miami Mice." In that

letter, Edelson merely acknowledged that "Miami Mice is an animated parody of Miami Vice." A mere intent to parody, however, should not give rise to a presumption of likelihood of consumer confusion. Indeed, as discussed above, a successful parody should serve to dispel consumer confusion rather than create it. *See Nintendo, supra,* 746 F.2d at 116.

The second letter plaintiffs rely on was a letter from Edelson to the Court dated September 30, 1985. In that letter, which was Edelson's "response to the complaint," Edelson reiterated that "Miami Mice is intended to be an animated, comical parody of TV cop/crime shows, not like other real life imitations of Miami Vice."

fendants did not intend to copy plaintiffs' television series so as to cause a likelihood of consumer confusion, the presumption that consumer confusion will occur is inapplicable.[15] *Compare, Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 467 F.Supp. 366 (S.D.N.Y.1979), *aff'd,* 604 F.2d 200 (2d Cir.1979). Moreover, even assuming *arguendo* that the presumption of consumer confusion arose on the facts of this case, that presumption has been rebutted by the differences between the t-shirts and the television series and by the absence of any survey evidence. *Cf. Nintendo, supra,* 746 F.2d at 117.[16]

15. Edelson also noted in the letter that he believed it was proper in our "free competitive consumer marketplace" to "emulat[e]" popular products until the market is saturated. The Court notes that section 43(a) of the Lanham Act is not designed to prevent people from taking advantage of popular trends in the marketplace. The harm that the Lanham Act seeks to protect against is the "misrepresentation of a common source." *See Warner Bros., supra,* 720 F.2d at 247. This letter does not indicate an intent to misrepresent or confuse consumers.

The final letter plaintiffs rely on was from Finn. This letter, dated August 27, 1985, was a response by Finn to plaintiffs' charges of unfair competition. *See* Defendants' Memorandum of Law in Opposition at Ex. D. Although Finn stated that, "[w]e are appreciative ... of the popularity of your product ...," Finn also denied any wrongdoing, claiming that "we do not believe there is any likelihood of confusion or intent to deceive by our use of rodents as obvious cartoon characters." *See id.*

The Court also notes that at the hearing on plaintiffs' motion for a preliminary injunction, Finn acknowledged that the Miami Vice series influenced the development of the t-shirts but denied that it was his intent to copy the series. Tr. at 69–71.

15. Plaintiffs rely on the district court opinion in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 467 F.Supp. 366 (S.D.N.Y.1979), *aff'd,* 604 F.2d 200 (2d Cir.1979), to establish a presumption of confusion. In this case reliance on *Dallas Cowboys* is misplaced. In *Dallas Cowboys,* the district court preliminarily enjoined defendants from showing a sexually explicit film entitled "Debbie Does Dallas." The film, which had "no other purpose than to display sex acts in minute detail," *see id.* at 370, focused on a high-school cheerleader, Debbie, who becomes a "Texas Cowgirl." In the film and in its advertisements, Debbie appeared in a cheerleading uniform which was almost identical to the plaintiff's protected trademark in the familiar Dallas Cowboys Cheerleaders' uniform. *See id.,* at 371.

In granting the preliminary injunction, the district court noted that the inference of a likelihood of confusion was readily drawn from the defendants' deliberate attempts "to cash in on the Dallas Cheerleaders' popularity and attracting power," *see id.* at 377, which indicated that the defendant expected consumer confusion. *See id.* at 375. The *Dallas Cowboys* case is distinguishable from the present case, however,

because there was overwhelming evidence in that case that the defendants intended and expected consumer confusion. In addition to defendants' use of a cheerleading uniform which was almost identical to the Dallas Cowboys Cheerleaders' uniform, the film was promoted with advertisements containing deliberately misleading phrases such as, "Starring Ex Dallas Cowgirl Cheerleader Bambi Woods" and "You'll Do More Than Cheer For this X Dallas Cheerleader." *See id.* at 371. The star of the film was never a Dallas Cowboys Cheerleader. In the present case, as noted above, there is no evidence that defendants deliberately intended to deceive the public into believing that plaintiffs were in any way connected with the Miami Mice t-shirts.

16. More than one month after the hearing in this case, plaintiffs raised for the first time a claim of copyright infringement. *See* Plaintiffs' Supplemental Brief, at 7. Although the Court subsequently granted plaintiffs leave to brief this issue, plaintiffs' complaint fails to allege copyright infringement. Moreover, at the first Pre-Trial Conference, plaintiffs specifically disclaimed a copyright infringement theory stating:

Basically what we have here is an unfair competition case—and I emphasize that—this is an unfair competition case. It is not a trademark case, it is not a copyright case. *See* Transcript of 9/20/85 Pre-Trial Conference at 2.

Assuming plaintiffs' complaint could be deemed amended to include this belated claim for copyright infringement, *cf. Studebaker Corp. v. Gittlin,* 360 F.2d 692, 694 (2d Cir.1966), plaintiffs have still failed to establish a likelihood of success on the merits. First, to succeed on a claim for copyright infringement, plaintiffs must establish a substantial similarity between the two works. *See Warner Bros., supra,* 720 F.2d at 239. Due to the differences between the television series and the t-shirts as noted above, it is unlikely that plaintiffs will be able to establish this element at trial. *Accord, Casey, supra,* 622 F.Supp. at 206. Moreover, given the obvious satiric effect of their rodent-like caricatures, defendants' t-shirts may fairly be characterized as a non-infringing parody under the "fair use" doctrine. *Cf. Warner Bros., supra,* 720 F.2d at 242.

In their final brief, plaintiffs also argued that defendants should be enjoined under New York's anti-dilution statute. N.Y.Gen.Bus.Law

## II. IRREPARABLE INJURY AND BALANCE OF HARDSHIPS

Since plaintiffs have failed to establish a probability of success on the merits, plaintiffs must establish sufficiently serious questions going to the merits making it a fair ground for litigation, irreparable injury, and a balance of hardships tipping decidedly in their favor to succeed in their preliminary injunction motion. *See Dallas Cowboys, supra,* 604 F.2d at 206–07.

 Plaintiffs have not demonstrated irreparable injury. The Court will not presume irreparable injury in the absence of a showing of a probability of success on the merits. *Cf. Windsor Industries, Inc. v. U.S. Diamond Imports,* 549 F.Supp. 415, 416–17 (S.D.N.Y.1982). Plaintiffs have failed to produce any evidence that the t-shirts have harmed plaintiffs' licensing program or the good will associated with plaintiffs' marks. Moreover, it appears that any losses suffered by plaintiffs as a result of the sale of the t-shirts, if proven, would be compensable in money damages after a full adjudication of plaintiffs' claims. *Accord, Casey, supra,* 622 F.Supp. at 206.[17]

Plaintiffs have also failed to establish a balance of hardships tipping decidedly in their favor. If anything, the hardships test favors defendants, since an injunction will prevent defendants from selling their inventory, whereas plaintiffs have not offered any evidence, as noted above, to indicate that plaintiffs will suffer any similar hardships if the injunction is denied.

§ 368–d (McKinney 1984). This claim was also not raised in the complaint. Even if this claim had been included in the complaint, however, the Court finds this claim to be without merit at this time because there has been no showing that plaintiffs' marks will be tarnished or blurred by the t-shirts. *See Warner Bros., supra,* 720 F.2d at 248; *Sally Gee, Inc. v. Hogan,* 699 F.2d 621, 624–26 (2d Cir.1983).

17. The Court rejects plaintiffs' argument that they will suffer irreparable injury because defendants are planning to develop a "Miami Mice" television series. There is no evidence that defendants have the imminent capacity to

## CONCLUSION

For all the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied. All parties shall appear before the Court for a Pre-Trial Conference on June 20, 1986 at 10:00 A.M.

It is SO ORDERED.

carry out such plans. Each of defendants' attempts to interest Paramount Pictures and plaintiffs, respectively, to develop such a series was flatly rejected. Moreover, assuming *arguendo* that such a series is developed at some later time, since the idea of a "Miami Mice" television series has not progressed beyond these two unsuccessful attempts by defendants, there is no way to determine if the series will be similar to the "Miami Vice" series. The mere possibility that defendants may at some future time develop a confusingly similar television series is too speculative and attenuated a basis for the issuance of a preliminary injunction at this time.