**REVLON, INC., Plaintiff,**

v.

**JERELL, INC., Defendant.**

**No. 89 Civ. 1042 (PKL).**

United States District Court, S.D. New York.

May 11, 1989.

---

Cowan, Liebowitz & Latman, P.C., New York City (Arthur J. Greenbaum and Richard S. Mandel, of counsel), for plaintiff.

James and Franklin, New York City (Robert L. Epstein, of counsel), Richards, Harris, Medlock & Andrews, Dallas, Tex., for defendant.

## OPINION AND ORDER

LEISURE, District Judge,

Plaintiff Revlon, Inc. ("Revlon") is one of the world's largest distributors of cosmetics, toiletries and perfumes, and distributes such products throughout the United States and the world. Defendant Jerell, Inc. ("Jerell") is a distributor of various lines of women's clothing. This dispute involves a mark associated with a particular marketing program of Jerell, which is challenged by plaintiff under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as under common law.

Plaintiff has moved, under Fed.R.Civ.P. 65, to preliminarily enjoin defendant from use of the challenged mark and program. The parties agree on the basic facts and controlling legal principles, and merely "disagree as to the legal conclusions to be drawn from the facts of this case." Defendant's Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Def. Mem."), p. 5.[1]

---

1. In such a case, where neither party has requested an evidentiary hearing, it is permissible for the Court to make its determinations upon the affidavits and submissions of the parties.

*See, e.g., Consolidated Gold Fields PLC v. Minorco S.A.,* 871 F.2d 252 (2d Cir., 1989); *Holt v. Continental Group, Inc.,* 708 F.2d 87, 90 n. 2 (2d

The following constitutes the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

*Background.*

As noted, Revlon is a large distributor of cosmetic products, which it describes as generally high quality, "upscale" merchandise. Affidavit of Robert A. Nielsen, sworn to on March 1, 1989 ("Nielsen Aff."), ¶ 3, 12. Revlon is not in the business of distribution, manufacture or sale of women's apparel, and there is no present indication that Revlon will ever seek to become involved in any aspect of the clothing industry.

In July 1988, Revlon began to display and market its various products together in special selling areas of department stores, and to identify those bays of cosmetic counters as "THE NINES." Nielsen Aff. ¶ 4–6. Within those areas, "nine separate lines of Revlon's cosmetics, toiletries and perfumes are sold." Complaint ¶ 8. The first such use was at a Dillard's department store in Corpus Christi, Texas, and the marketing strategy has subsequently been expanded to stores across the United States. There are now at least 40 stores featuring this particular marketing scheme, and that number is increasing rapidly. Nielsen Aff. ¶ 3.

Revlon has spent substantial sums of money on promotion, advertising and purchase of fixtures in connection with THE NINES program. Reply Affidavit of Robert A. Nielsen, sworn to on April 13, 1989 ("Nielsen Reply Aff."), ¶ 2. The program has been successful, resulting in substantial increases in the sales of the Revlon lines marketed under it. *Id.*, ¶ 3.

Defendant Jerell is a Texas corporation which designs, manufactures, distributes, and markets what it describes as "quality" fashion apparel. Affidavit of Gerald Frankel, sworn to on April 6, 1989 ("Frankel Aff."), ¶ 2. Jerell has been in the clothing business for 24 years, and is not involved in any way in the distribution of cosmetic products.

Jerell markets separate lines of clothing under different trademarks, including the "MULTIPLES," "SINGLES" and "PANTS–TO–GO" trademarks. The MULTIPLES lines embody a "modular" clothing concept, wherein separate pieces may be combined, mixed and matched. In August 1987, Jerell began to utilize a "shop within a shop" strategy to market the MULTIPLES lines in department stores. This strategy involved free standing specialized fixtures, and specially trained sales personal. The concept is said to evoke "the kind of trained and knowledgeable service that was the standard for department stores of eras past but is rarely offered by today's stores." Frankel Aff. ¶ 5. In addition to the MULTIPLES, Jerell has been successful with its SINGLES and PANTS–TO–GO lines, apparently employing more traditional marketing strategies.

In late 1988, Jerell began to plan a unified marketing scheme for these three lines of clothing. Jerell saw such a plan as an extension of Jerell's existing marketing techniques. Frankel Aff. ¶ 10. The three product lines were perceived as progressive, modern and unique, and Jerell consequently chose the name "INTO THE NINETIES" for the marketing scheme.

There is no adequately supported allegation that, prior to the commencement of this lawsuit, Jerell was contacted by Revlon or actually knew of the Revlon program. Jerell denies any such knowledge. Frankel Aff. ¶ 14. After development of its own marketing scheme, Jerell conducted a diligent computer search of federal and state trademarks. That search did not reveal the Revlon mark, or any other entity using THE NINES mark. Jerell has applied for federal registration of its INTO THE NINETIES mark, and the United States Patent Office has not, as of yet, cited the Revlon mark against the Jerell application. Frankel Aff. ¶ 17. During discussions between Jerell and Dillard's Department stores, where the Revlon program was piloted, potential problems with the Revlon mark were not raised.

Cir.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1294, 79 L.Ed.2d 695 (1984).

Jerell has expended, and continues to expend, substantial sums on the promotion of its clothing lines, including the INTO THE NINETIES program. A good portion of Jerell's staff and marketing team have devoted significant time to development of the scheme; expenditures for salary, travel and promotional expenses alone presently approach a quarter of a million dollars. Jerell cooperates extensively with its retailers, sharing the cost of development and installation of each INTO THE NINETIES shop. Frankel Aff. ¶ 20. Individual retailers make substantial commitments in adopting the Jerell program. The space within a department store is reapportioned, and its business is disrupted during the installation of the specialized free standing shops. Jerell has attested to the severe harm it would incur if its marketing scheme were enjoined. Frankel Aff. ¶¶ 12, 20.

Both Jerell and Revlon seek to market their products through nationally known quality department stores. Nielsen Aff. ¶ 3; Frankel Aff. ¶ 8. Defendant's individual clothing lines and plaintiff's individual cosmetics lines are well known, distinctive, and identified by their own particular trademarks; it is unlikely that either class of items are primarily bought upon impulse. Frankel Aff. ¶ 21. Wearing apparel and cosmetics are sold in separate physical areas of a particular department store. In sum, Revlon and Jerell offer their own distinct specialized sales services, for their non-competing products, in different selling areas, under different marks, in different geographic areas of department stores.

*Discussion.*

1. Standards for Preliminary Injunction.

It is well established that the "extraordinary and drastic remedy" of preliminary injunctive relief will not, and should not, be routinely granted by the courts. *See, e.g., Medical Society of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977); *Buffalo Courier–Express, Inc. v. Buffalo*

*Evening News, Inc.,* 601 F.2d 48, 59 (2d Cir.1979). In this Circuit:

A preliminary injunction may only issue when the moving party has shown (a) irreparable harm; and (b) either (i) a likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits to be a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Inverness Corporation v. Whitehall Laboratories,* 819 F.2d 48, 50 (2d Cir.1987).

■ The "irreparable" harm prong of the preliminary injunction standard is not disputed by Jerell here; if there is a protectable mark and a likelihood of confusion sufficient to violate the Lanham Act, the irreparable harm that would be suffered plaintiff is inevitable.[2] *See, e.g., Church of Scientology Intern. v. Elmira Mission,* 794 F.2d 38, 41 (2d Cir.1986); *American Home Products Corp. v. Johnson Chemical Co. Inc.,* 589 F.2d 103, 106 (2d Cir. 1978); *Upjohn Co. v. American Home Products Corp.,* 598 F.Supp. 550, 555 (S.D. N.Y.1984).

The real issues here involve the second prong of the preliminary injunction standard, and the closely related inquiries which turn upon appraisal of the actual merits of the claim.

2. Merits of the Dispute.

*A. Protectable Mark.*

■ The mark upon which plaintiff sues is unregistered; the first step in evaluating whether such a mark has been infringed is determining whether the mark actually merits protection. *See, Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976); *see also, Yarmuth–Dion, Inc. v. D'ion Furs, Inc.,* 835 F.2d 990, 993 (2d Cir.1987). The nature of the mark is crucial; "[a]rrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbi-

---

**2.** Jerell does take issue with Revlon's position that Revlon's "upscale" cosmetic products would be tarnished by association with the Jerell lines of clothing. *See,* Def. Mem., p. 13. *See also,* Part 2.B. below. The point is not pressed, however, in the context of irreparable harm.

trary or fanciful." *Abercrombie, supra*, 537 F.2d at 9.

Classifying a particular mark under one of these categories in not a precise or exact undertaking. *See, e.g., Banff, Ltd. v. Federated Department Stores, Inc.*, 841 F.2d 486, 489 (2d Cir.1988); *20th Century Wear Inc. v. Sanmark Stardust Inc.*, 747 F.2d 81, 87 n. 6 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). Placement of the mark into some sort of context, however, is necessary not only for this threshold consideration, but, as indicated below, for evaluation of the likelihood of confusion between the senior and challenged marks.

Revlon argues that its THE NINES mark is entirely fanciful. Jerell responds that the mark is merely descriptive or numerical, and, in support, cites plaintiff's own complaint in this action. That Complaint explicitly indicates that the concept is linked to the "nine ... lines" of Revlon products incorporated into the marketing scheme, and plaintiff does not directly rebut that connection. Additionally, Jerell raises serious questions about what exactly plaintiff is seeking to protect. The allegedly similar marketing techniques here are argued by plaintiff to be relevant as part of a "combination" of factors leading to confusion between the respective marks,[3] but it is clear that such techniques are not, in and of themselves, *independently* protectable.

The doubt that defendant raises about the proper characterization of plaintiff's mark militates in some degree against the granting of preliminary injunctive relief. It is likely, however, that the Revlon mark itself is sufficiently distinctive and fanciful to accord it a high degree of protection under the Lanham Act. As such, the mark would be entitled to protection even without a showing of secondary meaning in the marketplace. *See, 815 Tonawanda Street Corporation v. Fay's Drug Company*, 842 F.2d 643, 647 (2d Cir.1988); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir.

1985). Accordingly, plaintiff would be entitled to protect its mark against confusingly similar marks.

### B. Likelihood of Confusion.

The second step of the analysis must begin, as both parties recognize, with the seminal case of *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.) (Friendly, J.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Although the factors set out in *Polaroid* for determining the prior owner's chance of success are not exclusive or rigid, they provide the framework for the Court's inquiry. In assessing the similarity of the two marks, it is the overall "effect upon purchasers that is important," and the Court thus focuses on "the general impression conveyed by the two marks." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1133, 1134 (2d Cir.1979).

The first factor to be considered is the actual strength of the mark. "Strength" refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods or services sold under the mark as emanating from a particular source. *McGregor–Doniger, Inc. v. Drizzle, Inc.*, *supra*, 599 F.2d at 1131. As noted above, the likely classification of THE NINES mark as a fanciful and arbitrary mark would correspondingly indicate that it is a "strong" mark. Nevertheless, defendant has pointed to the possibility that the mark might in fact be merely descriptive. Additionally, the mark is a recent innovation, without longstanding identification built up over an extended period of time. Although substantial sums have been spent by Revlon in connection with the mark, those sums have been expended recently, over a relatively short period. The strength of the mark is an important consideration, but as indicated below, the probable "strong" mark of plaintiff is not dispositive for present purposes.

---

**3.** As indicated in Part 2.B. below, *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) sets out factors relevant to the

issue of likelihood of confusion. While that enumeration is not meant to be exclusive, the Court notes that marketing techniques are *not* explicitly mentioned as a relevant concern.

With regard to actual confusion, plaintiff has not put forward any evidence, or even asserted, that consumers have actually been confused. Plaintiff is not required, of course, to adduce evidence of actual confusion to obtain injunctive relief. *See, e.g., Standard and Poor's Corp. v. Commodity Exchange,* 683 F.2d 704, 708 (2d Cir.1982). In certain situations, however, the Court may infer that there is no likelihood of consumer confusion from an absence of survey evidence to the contrary. *Universal City Studios v. T–Shirt Gallery, Ltd.,* 634 F.Supp. 1468, 1479 (S.D.N.Y. 1986). The Court here merely notes that no evidence of actual confusion is presently before the Court.

Comparison of the respective marks indicates that they are, on their face, significantly *dis* similar. Similarity between marks occurs when the marks are the same in appearance, sound and meaning. *See,* 3A R. Callman, *Unfair Competition, Trademarks and Monopolies,* ¶ 20.13 (4th ed. 1983). As defendant points out, the size, word count, configuration and syllable count of THE NINES and INTO THE NINETIES marks demonstrate fundamental differences in appearance and sound. Def. Mem., pp. 9–10.

With regard to meaning, as well, the connotations of the two phrases are not related. THE NINES suggests the number nine, or nine of something in a group. INTO THE NINETIES is clearly a reference to the decade of the 1990's, and more generally to the future. Such differences of connotation and meaning are key factors in determining the likelihood of confusion. Differing connotations themselves can be determinative, even where identical words with identical meanings are used. *Clarks of England, Inc. v. Glen Shoe Company,* 485 F.Supp. 375, 379 (S.D.N.Y.1980). Where, as here, everyday words with common meanings are used, the differences rather than the similarities become more noticeable. *Procter & Gamble v. Johnson*

*& Johnson, Inc.,* 485 F.Supp. 1185, 1197 (S.D.N.Y.1979), *aff'd without opinion,* 636 F.2d 1203 (2d Cir.1980).

Plaintiff's attempt to show that the meanings of the respective marks are similar is not persuasive. Although Revlon has used its mark in conjunction with references to the future and the decade of the 1990's, *see* Nielsen Aff. ¶ 7; Complaint Exh. A, it ignores the admitted link between THE NINES and its nine lines of products. To the extent that Revlon seeks to appropriate for itself all references to the future or the next decade, that effort is not reflected in the apparent meaning of its mark here.

Examination of the similarity, or more properly the lack of similarity, between the respective goods or services also weighs against plaintiff's chance of ultimate success on the merits. While in a general sense cosmetics and wearing apparel may be "related" products, the goods at issue here do not serve common functions, are not competitive, do not share any physical attributes at all, and are not inherently comparable. Plaintiff primarily relies upon *Scarves by Vera, Inc. v. Todo Imports Ltd,* 544 F.2d 1167 (2d Cir.1976) in arguing that the proximity of wearing apparel and cosmetic products necessarily indicates likely confusion. In *Scarves by Vera,* however, other significant factors led to a finding of confusion, including a strong, thirty year old, registered senior mark, and an *identical* mark by the junior user. Additionally, that case, unlike this one, involved proof that the "plaintiff's recognition is equivalent to that of [fashion] designers who had expended into the cosmetics and fragrances fields. Like those other designers, plaintiff appeals to the name conscious customer." *Scarves by Vera, supra,* 544 F.2d at 1174.[4]

Plaintiff places much emphasis on the argued similarity of the marketing context in which the Revlon and Jerell marks are employed. *See, e.g.,* Plaintiff's Reply

---

4. Plaintiff also cites *Edison Bros. Stores Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547 (S.D.N.Y.1987). In that case it was found that there was *no* likelihood of confusion for shoes and perfume bearing the same mark, partly because of differences in the physical attributes of the goods. *Id.* at 1557.

Memorandum, p. 5. Similarity of marketing channels and methods can be relevant in determining whether the possibility of confusion exists, and, in cases involving directly competing products, that similarity can be controlling. *See, e.g., Miller Brewing Co. v. Carling O'Keefe Breweries*, 452 F.Supp. 429, 447 (W.D.N.Y.1978). However, the argued similarity of services in the present case, namely the generally shared "shop within a shop" concept, is not likely to lead to confusion as to the source of the subject goods. This is especially true considering that the "similar" marketing circumstances essentially involve strategies of sale within large department stores, where consumers expect to shop for a wide variety of goods from various sources. Consequently, an argument based on similarity of marketing context here is somewhat less than persuasive. *See King Research, Inc. v. Shulton, Inc.*, 324 F.Supp. 631, 638 (S.D.N.Y.1971), *aff'd*, 454 F.2d 66 (2d Cir.1972).

■ The parties do not extensively address the impact of the sophistication or lack of sophistication of their respective customers, and it is not a determinative factor in this case. To the extent that a distributor sells its products to apparently sophisticated shoppers at high quality department stores, customer sophistication usually militates against a finding of a likelihood of confusion. *See, e.g., Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir.1983).

The lack of evidence supporting an inference that Jerell intentionally copied the Revlon mark also weighs against Revlon's ultimate success in establishing a likelihood of confusion under the Lanham Act.[5] Similarly, there is not a scintilla of evidence, nor even an allegation by Revlon, that plaintiff is likely to "bridge the gap" from cosmetics to women's apparel.

If plaintiff could establish that defendant's goods were of inferior quality, it might, as the senior user, be entitled to protection of "the good reputation associated with [its] mark from the possibility of being tarnished by inferior merchandise." *Scarves by Vera v. Todo Imports*, 544 F.2d 1167, 1172 (2d Cir.1976). Revlon's arguments regarding the relative quality of its own products as compared with those of Jerell, however, are unsubstantiated and unconvincing. Where there is no evidence that a junior user is selling inferior merchandise or engaging in disreputable trade practices, this concern may be dismissed summarily. *Cf. Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 49 (2d Cir.1978) (per curium), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

■ In sum, evaluation of all of the relevant factors enumerated in *Polaroid* and its progeny indicates that plaintiff cannot demonstrate a likelihood of success on the merits, nor sufficiently serious questions going to the merits to be a fair ground for litigation. While Revlon may possess a strong mark worthy of a high degree of protection, *all* of the other considerations tip, in varying degrees, in favor of Jerell. In other words, plaintiff's mark may be worthy of protection, but it does not appear to be threatened by this defendant's mark.

Perhaps recognizing these shortcomings, plaintiff accuses defendant of "considering the marks in isolation" and ignoring the "realities of the market." Plaintiff's Reply Memorandum, p. 5. The *Polaroid* framework reflects those very market realities, however, and defendant's proper examination of all of the relevant elements indicates that plaintiff will be hard pressed to show a likelihood of confusion. Plaintiff's

---

**5.** In a submission following the full briefing of this motion, plaintiff submitted excerpts of transcribed deposition testimony of Gerald Frankel ("Frankel"), the President of Jerell. *See,* Letter Dated April 24, 1989. In that testimony, Frankel acknowledges general familiarity with a trade publication which had run articles discussing the Revlon program, but again denied specific knowledge of the Revlon scheme. Frankel also

acknowledged that the Jerell INTO THE NINETIES program includes ongoing investments, and the planned opening of additional shops.

Plaintiff argues that this testimony is indicative of bad faith, and consequently relevant to the likelihood of confusion issues. The Court is not so persuaded, and such evidence does not alter the conclusions above.

failure to acknowledge the factors which cut strongly against it is not cured by its attempt to focus exclusively on what it terms "strikingly similar" marketing strategies. As noted above, the Court does not agree with plaintiff's characterization of those strategies, or the significance they have to the present inquiry.

### 3. Balance of Hardships.

Even if there were serious questions going to the merits which were sufficient to provide a fair ground for litigation, it is clear that the balance of hardships does not "tip decidedly" toward the plaintiff. *See Inverness Corporation, supra,* 819 F.2d at 50.[6] As indicated above, both parties have invested substantial sums and time into their respective marketing programs. Disruption of Jerell's program, even for a limited time, would seriously harm its important and ongoing relationships with its retailers. Compared with the remote possibility of harm to plaintiff's mark, the balance of hardships cannot be said to tip in favor of plaintiff, much less "decidedly" so.

### CONCLUSION

In the present case, plaintiff has not shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to be a fair ground for litigation. Even if such a fair ground for litigation existed, the balance of hardships does not tip decidedly in favor of plaintiff. Consequently, plaintiff's motion for a preliminary injunction under Fed.R.Civ.P. 65 is denied.

SO ORDERED.

---

6. Plaintiff has, perhaps unwittingly, helped to demonstrate this point, through a supplemental submission made after this motion was fully briefed. *See infra,* note 5. Revlon originally argued that the hardship to Jerell was minimal, because Jerell's own marketing program was limited in scope. *See,* Plaintiff's Reply Memorandum, p. 7. The deposition transcript subsequently submitted by plaintiff indicates that, in fact, Jerell has several INTO THE NINETIES shops, and is in the process of developing more.